No. 22-13691-HH

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

WILLIAM HORNADY, ET AL.,

*Appellees–Cross-Appellants,*

vs.

OUTOKUMPU STAINLESS USA, LLC,

*Appellant–Cross-Appellee.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF ALABAMA
NO. 1:18-CV-00317-JB-N

### BRIEF OF APPELLANT

Cheri Turnage Gatlin
BURR & FORMAN LLP
190 East Capitol Street
Suite M-100
Jackson, Mississippi 39201
(601) 709-3444

Devin C. Dolive
BURR & FORMAN LLP
420 North 20th Street
Suite 3400
Birmingham, Alabama 35203
(205) 251-3000

*Attorneys for Appellant Outokumpu Stainless USA, LLC*

No. 22-13691-HH

# IN THE UNITED STATES COURT OF APPEALS FOR THE ELEVENTH CIRCUIT

WILLIAM HORNADY, ET AL.,

*Appellees–Cross-Appellants,*

vs.

OUTOKUMPU STAINLESS USA, LLC,

*Appellant–Cross-Appellee.*

## APPELLANT OUTOKUMPU STAINLESS USA, LLC'S CERTIFICATE OF INTERESTED PERSONS

Counsel of record for Appellant Outokumpu Stainless USA, LLC ("Outokumpu") certify that the following persons may have an interest in the outcome of this appeal. Outokumpu makes these representations for the Judges of this Court to evaluate possible disqualification or recusal:

Adams & Reese, LLP

Adams, Rosa*[1]

ADP, Inc.

Ainsworth, Richard L.*

Alexander, Melinda*

---

[1] The persons noted with an asterisk are the plaintiffs/opt-ins listed in the final judgment. (Doc. 410.)

No. 22-13691-HH

*William Hornady, et al. v. Outokumpu Stainless USA, LLC*

Allen, Christopher*

Allen, Garner*

Amundson, Joseph*

Anderson, Kelley*

Appleby, Esq., Gavin S.

Arnold, Jeffrey Scott*

Averette, Brandon*

Averette, Chase*

Averette, Cory*

Bailey, Dave Shawn*

Baker, Jonathan*

Banks, Johnnie*

Barnes, Timothy*

Barnett, Michael Blane*

Bass, James*

Bates, Timothy*

Batson, Raymond*

No. 22-13691-HH

*William Hornady, et al. v. Outokumpu Stainless USA, LLC*

Beason, Jeremy**

Beaverstock, Hon. Jeffrey U.

Beckham, LaRosa**

Belcher, Emily**

Bennett, Nathen**

Betts, Clifton**

Bishop, Austin**

Bishop, Douglas**

Bivins, Hon. Sonja F.

Blair, Shirley**

Bloebaum, Christopher**

Boyd, Amy**

Boyd, Steven**

Boyette, Jeremy**

Boykin, Isiah**

Braggs, DeMarcus**

Bramble, Alexandria**

No. 22-13691-HH

*William Hornady, et al. v. Outokumpu Stainless USA, LLC*

Branscum, Robert**

Briscoe, Thomas Arron**

Brooks, Jr., Redius Wayne**

Brown, Jerel**

Brown, Kenneth**

Bryant, Jr., Donnice L.**

Burr & Forman LLP

Burrell, Patrick**

Butters, Derek**

Byrd, Jr. Dennis**

Byrd, Jr. Robert**

Byrd, Philip**

Cain, James**

Carnley, Jr., Franklin E.**

Carpenter, Justin**

Carpenter, Quintin**

Carpenter, Steve**

No. 22-13691-HH

*William Hornady, et al. v. Outokumpu Stainless USA, LLC*

Chapman, Floretta**

Chapman, Timothy**

Clark, Vidal**

Clarke, III John**

Clausell, Napoleon**

Coleman (Banks), Katherine**

Coleman, Daniel**

Collins, Blake**

Coston, Renada**

Crane, Clayton**

Curry, Thomas**

Daly, Esq., Sinead

Davis, Davis and Associates

Deas, Ivy**

Dew, Trawick**

Dixon, Alkeyia**

Doggett, Eric**

No. 22-13691-HH

*William Hornady, et al. v. Outokumpu Stainless USA, LLC*

Donaldson, Sadrick**\***

Dolive, Esq., Devin C.

Dunn, Casey**\***

Dunn, Michael**\***

Easterbrook, Caleb**\***

Edmonds, Gregory**\***

Emrick, Trenton**\***

Erwin, Ellen**\***

Euler Hermes North American Insurance Company

Everett, James**\***

Evers, Charles B.**\***

Evers, Daniel**\***

Fairchild, Larry**\***

Faulk, Derek**\***

Fleming, Bryan**\***

Flowers, John**\***

Flowers, Jr., Esq., Ronald W.

No. 22-13691-HH

*William Hornady, et al. v. Outokumpu Stainless USA, LLC*

Foster, Charlie*

Franklin, Taurus*

Fraticelli, Jose*

Freeman, Brandon*

Freeney, Frank*

Gallatin, Lance*

Ganey, Forest*

Gates, William Keith*

Gatlin, Brent*

Gatlin, Esq., Cheri Turnage

Godwin, Andrew*

Goodman, Charles Stephen*

Graham, Thomas*

Green, Corey*

Green, Glenn*

Grice, Carin*

Grice, Robert Jason*

No. 22-13691-HH

*William Hornady, et al. v. Outokumpu Stainless USA, LLC*

Gross, Perry**\***

Gustaf, Steven**\***

Hall, Nicholas**\***

Hardy, Matthew**\***

Harris, Jerry**\***

Harris, Kenneth**\***

Hartery, Colin**\***

Hartley, Jerry**\***

Havens, Dustin**\***

Helmsing, Jr., Esq., Frederick George

Helton, Brett D.**\***

Helveston, Pelly**\***

Henderson, Andrew**\***

Hill, David**\***

Holston Vaughan & Rosenthal LLC

Hornady, William Austin**\***

Hornady, William Heath**\***

No. 22-13691-HH

*William Hornady, et al. v. Outokumpu Stainless USA, LLC*

Howze, Daric**

Hubbard, John**

Hudson, Wilson**

Hunt, Reginald**

Hyde, Thomas**

Jackson, Lemuel**

Jackson, Major**

Jackson, Matthew**

Jackson, Esq., Matthew Ryan

January, Martez**

Jenkins, Shirley**

Jerkins, Ronald**

Jerkins, William**

Johnson, Timothy**

Johnson, Yolanda**

Johnston, Austin**

Jones, James**

C-9 of 20

No. 22-13691-HH

*William Hornady, et al. v. Outokumpu Stainless USA, LLC*

Jones, Jerry**

Jones, Rodney**

Jones, Steven**

Jones, William V.**

Jordan, Craig**

Jordan, George**

Joyce, James**

Keenum, Weston**

Kelly, Joel**

Kemp, George**

Key, Robert**

Knapp, Gaven L.**

Knight, Mark**

Langley, Jeremy**

Lankford, Phillip**

Lapp, Kyle**

Lee, James T.**

No. 22-13691-HH

*William Hornady, et al. v. Outokumpu Stainless USA, LLC*

Littler Mendelson, P.C.

Long, Robert**

Lord, John**

Lott, Aubrey**

Love, Andre**

Lowe, Domonic**

Madaris, Randall**

Marks, Josephine**

Marshall, Cedric Antonio**

Marshall, Cedric D.**

Marshall, Fredrick**

Marshall, Ronald A.**

Martin, Jimmy**

McClain, III, Arthur**

McDowell Knight Roedder & Sledge, L.L.C.

McGraw, John David**

McNeil, Antonio**

No. 22-13691-HH

*William Hornady, et al. v. Outokumpu Stainless USA, LLC*

Meinhardt, Lawrence**

Middleton, Daniel**

Miller, Christopher**

Miller, Seth**

Miller, Tyris**

Mitchell, Damon**

Mitchell, Tyrone**

Montgomery, Mark**

Moore, Anthony D.**

Moore, Brian**

Moore, Colundus**

Moore, Laurice**

Moore, Phillip**

Murphy, John**

Nations, Matthew**

Neely, Reginald**

Nelson, Hon. Katherine P.

C-12 of 20

No. 22-13691-HH

*William Hornady, et al. v. Outokumpu Stainless USA, LLC*

Nations, Matthew**\***

Neely, Reginald**\***

Nelson, Hon. Katherine P.

Newton Vernon**\***

Norris, Cody**\***

Odom, Raymond**\***

Olive, Jimmy**\***

Oliver, Victor**\***

Outokumpu Americas, Inc.

Outokumpu Holding Nederland BV

Outokumpu Oyj (OUT1V:HEL)[2]

Outokumpu Stainless USA, LLC

Overton, Johnny**\***

---

[2] Solidium Oy, a Finnish state owned investment company, holds more than 10% of Outokumpu Oyj's stock.

No. 22-13691-HH

*William Hornady, et al. v. Outokumpu Stainless USA, LLC*

Owens, Gregory**

Patterson, Clarence, L.**

Peoples, John**

Perez, Joe**

Petty, Kenneth F.**

Phelps, Vernon**

Phillips, Ronald**

Phillips, William Joseph**

Pollard, Jerry**

Porter, Jacob**

Powell, IV, Esq., Charles A.

Pruett, John**

Ramey, Esq., E. Travis

Reach, Charles**

Redding, Jeffery**

Reed, Jr., Jerry**

Reed, Sr., Jerry**

No. 22-13691-HH

*William Hornady, et al. v. Outokumpu Stainless USA, LLC*

Reese, LaTorisa**

Rivers, Korey S.**

Rocker, John**

Rodgers, Marcus**

Rogers, Anissa**

Rogers, Harold**

Rone, Wesley A.**

Rosenthal, Esq*.,* Ian David

Rouss, Stephen**

Rutledge, Ronnie**

Sawyer, Bill**

Scott, Darrell**

Seals, Kenneth**

Sheffield, Esq., Ryan B.

Sherrer, III, John F.**

Showers, Michael**

Sims Law Firm

No. 22-13691-HH

*William Hornady, et al. v. Outokumpu Stainless USA, LLC*

Sims, Esq., Patrick H.

Sliwinski, Charles*

Smith, David O.*

Spencer, Sophia*

Simmons, Brandon*

Stadmire, Shonda*

Stallworth, Kenneth*

Starling, Connie*

Stewart, Franklin*

Stewart, Michael*

Stewart, Paul*

Stewart, Takendric*

Stinson, Jerry*

Stoker, J. J.*

Stokes, Martin*

Sutton, Sr. William G.*

Swain, Esq., Jennifer F.

No. 22-13691-HH

*William Hornady, et al. v. Outokumpu Stainless USA, LLC*

Taylor, Lee**

Thomas, Richard Dewayne**

Thompson, Carlie**

Thornton, Cody**

Todd, Cheryl**

Tucker, Jason**

Turner, James**

Vaughan, Kourtney**

Voiles, Randy**

Walker, Sharon**

Wallace, Steven T.**

Ware, Kody**

Wasden, Esq., H. William

Washington, Marvin**

Waters, Luke**

Watson, Jamlus**

Weaver Kendall**

No. 22-13691-HH

*William Hornady, et al. v. Outokumpu Stainless USA, LLC*

Webb, Jerald**

Welch, Collin**

Welch, Derek**

Whigham, Stony**

Wicker, William**

Wiggins, Jamie**

Wiley, Ginger**

Wilkerson, David**

Wilkes, Johnny**

Wilkinson, Richard**

Williams, Anthony**

Williams, Bradley**

Williams, Carl**

Williams, David**

Williams, Eric**

Williams, Gregory L.**

Williams, Jr., Rufus**

No. 22-13691-HH

*William Hornady, et al. v. Outokumpu Stainless USA, LLC*

Williams, Kendall**

Williams, Michael**

Williams, Myron**

Williams, Neil**

Williamson, Jr., George Baker**

Wilson, Harold**

Wilson, Lafayette**

Wilson, Michael**

Wilson, Timothy C.**

Wingate, Wesley**

Witherington, Johnnie**

Witherspoon, Midarius**

Wolfe, Christian**

Womack, Orenthal**

Woodard, Andre**

York, James**

York, Michael**

No. 22-13691-HH

*William Hornady, et al. v. Outokumpu Stainless USA, LLC*

Zirlott, Jonathon**\***

Zoghby, Alexander Garrett

                                    s/ Devin C. Dolive
                                    Devin C. Dolive

                                    One of the Attorneys for
                                    Appellant Outokumpu Stainless
                                    USA, LLC

**OF COUNSEL**
Devin C. Dolive
BURR & FORMAN LLP
420 North 20th Street
Suite 3400
Birmingham, Alabama 35203
(205) 251-3000
ddolive@burr.com

Cheri Turnage Gatlin
BURR & FORMAN LLP
190 East Capitol Street
Suite M-100
Jackson, Mississippi 39201
(601) 709-3444
cgatlin@burr.com

## <u>Statement Regarding Oral Argument</u>

Oral argument is warranted because this appeal involves an unprecedented sanction in the form of a $13.1 million default judgment (Doc. 410) entered against a litigant—not its counsel—both for "discovery violations" and for then-counsel's "actual misrepresentations" to the trial court. (Doc. 442, PageID 8021.) The district court imposed these sanctions in an FLSA collective action case that should have had a maximum value, on fact-intensive "rounding" overtime claims, of $2 million (if Plaintiff William Heath Hornady and the 275 other employees had prevailed on their FLSA claims). (Doc. 406, PageID 6647; Doc. 410, PageID 6848.)

Moreover, oral argument is warranted because this appeal presents at least two issues of first impression in this circuit. The first concerns the standard of review to apply when reconsidering a non-final default. The district court entered default against Defendant Outokumpu Stainless USA, LLC ("OTK") as a sanction after more than three years of litigation. Before the district court entered any final judgment, OTK moved to have the default set aside. In its Order denying OTK's request, the district court stated, "[t]hough the Eleventh Circuit has provided

some guidance on the procedural use of a nonfinal default judgment, it has not spoken directly as to which standard to apply when reconsidering this type of order." (Doc. 409, PageID 6829.) Thus, the standard to apply in this context appears to be an issue of first impression and should be heard at oral argument.

The second issue of first impression concerns the proper interpretation of a regulation of the Department of Labor ("DOL"), 29 C.F.R. § 778.210, regarding how to treat non-discretionary, percentage-based bonus payments under the FLSA. The Eleventh Circuit has not had occasion to interpret this DOL regulation, and the district court's interpretation of the law is contrary to the Ninth Circuit's interpretation of this same DOL regulation. *See Russell v. Gov't Emps. Ins. Co.*, 787 F. App'x 953, 954 (9th Cir. 2019). Therefore, oral argument would be beneficial to ensure that the district court's rulings on appeal do not lead to a circuit-split.

In sum, oral argument is likely to significantly aid the Court's decisional process, and OTK requests oral argument. *See* Fed. R. App. P. 34(a)(2); 11th Cir. R. 34-3(b).

ii

## **Table of Contents**

Statement Regarding Oral Argument .......................................................i

Table of Contents ..............................................................................ii

Table of Citations .............................................................................v

I.    Statement of Jurisdiction................................................................1

II.   Statement of the Issues..................................................................2

III.  Statement of the Case ....................................................................3

    A.    Nature of the Case ...............................................................3

    B.    Statement of Facts and Procedural History............................5

        1.    OTK's time-keeping system and pay practices. ............5

        2.    Mr. Hornady files this lawsuit and obtains certification as a collective action. ................................7

        3.    Discovery, discovery disputes, and Hornady, et al.'s requests for sanctions. .............................................8

        4.    Another motion for sanctions.......................................10

        5.    The Third Amended Complaint changes the scope of the lawsuit...............................................................13

        6.    Discovery and sanctions request redux. ......................15

        7.    The magistrate judge issues Reports and Recommendations, and the sanctions question comes before the district judge. ..................................16

        8.    OTK replaces Littler with new, non-conflicted counsel, and the district court sanctions OTK with a default.......................................................................22

9.    OTK pays attorneys' fees to Hornady, et al. and unsuccessfully seeks reconsideration of the default while the district court addresses damages. ...............23

10.    The district court enters a final judgment, and the parties appeal. ...........................................................24

C.    Standards of Review ...........................................................27

IV.    Summary of the Argument .....................................................29

V.    Argument...............................................................................31

A.    The district court denied OTK's due-process rights by refusing to consider evidence developed through new, non-conflicted counsel when hitting OTK with a $13.1 million default judgment........................................................31

B.    The district should have applied a "good cause" standard to set aside the default, and the district court's refusal even to consider whether or not OTK had shown "good cause" requires reversal. .......................................................42

C.    The discovery sanctions are inappropriate and denied OTK due process because Hornady, et al. have now received the missing evidence prompting their request for sanctions, and further, that evidence goes far beyond what is typical for discovery in collective actions and contradicts the pleading in the Third Amended Complaint. ............................................................47

D.    The district court erred when interpreting the law governing FLSA claims and improperly credited erroneous legal interpretations in the Third Amended Complaint. ............................................................56

E.    The Final Default Judgment should be reversed because it is based on damage calculations that were not pleaded and were not supported by any "detailed affidavits." ..........62

VI.    Conclusion ...................................................................64

iv

Certificated of Compliance .......................................................... 66

Certificate of Service ................................................................. 67

## Table of Citations

Cases:                                                                              Page(s)

*Adolph Coors Co. v. Movement Against Racism & the Klan,*
   777 F.2d 1538 (11th Cir. 1985) ....................... 3, 29, 31, 32, 33, 63

*African Methodist Episcopal Church, Inc. v. Ward,*
   185 F.3d 1201 (11th Cir. 1999) .................................................. 44

*Aguilar v. Mgmt. & Training Corp.,*
   948 F.3d 1270 (9th Cir. 2020) ................................................... 50

*Allen v. Bd. of Pub. Educ. for Bibb Cnty.,*
   495 F.3d 1306 (11th Cir. 2007) .................................................. 47

*Anderson v. Mt. Clemens Pottery Co.,*
   328 U.S. 680 (1946) ................................................................... 47

*BankAtlantic v. Blythe Eastman Paine Webber, Inc.,*
   12 F.3d 1045 (11th Cir. 1994) .................................................... 33

*Barragan v. Home Depot U.S.A., Inc.,*
   No. 3:19-cv-01766, 2021 WL 3634851
   (S.D. Cal. Aug. 17, 2021) ..................................................... 60, 61

*Bonner v. City of Prichard,*
   661 F.2d 1206(11th Cir. 1981) .................................................. 28

*Bujalski v. Kozy's Rest., Inc.,*
   No. 7:13-CV-01446-MHH, 2017 WL 57344
   (N.D. Ala. Jan. 5, 2017)............................................................. 61

*Byrne v. Nezhat,*
   261 F.3d 1075 (11th Cir. 2001), *abrogated on*
   *other grounds by Bridge v. Phoenix Bond*
   *& Indem. Co.,* 553 U.S. 639 (2008),..................................... 38, 39

Cases:                                                                    Page(s)

*Chudasama v. Mazda Motor Corp.,
    123 F.3d 1353 (11th Cir. 1997) ...........................27, 31, 32, 33, 34

Cmty. Dental Servs. v. Tani,
    282 F.3d 1164 (9th Cir. 2002) ..................................................... 39

Compania Interamericana Exp.-Imp., S.A. v. Compania
Dominicana de Aviacion,
    88 F.3d 948 (11th Cir. 1996) ...................................................... 44

Cranney v. Carriage Servs., Inc.,
    No. 2:07-CV-01587-RLHPAL, 2008 WL 2457912
    (D. Nev. June 16, 2008).............................................................. 53

Donaldson v. Clark,
    819 F.2d 1551 (11th Cir. 1987) .................................................. 39

EEOC v. Troy State Univ.,
    693 F.2d 1353 (11th Cir. 1982) .................................................. 48

*Emerick v. Fenick Indus., Inc.,
    539 F.2d 1379, 1381 (5th Cir. 1976) ................................... 28, 34

Flowers v. City of Detroit,
    306 F. App'x 984 (6th Cir. 2009)................................................ 41

Gibson v. Outokumpu Stainless USA, LLC,
    No. 21-00103-JB-N, 2023 WL 2604812,
    (S.D. Ala. Mar. 22, 2023)................................................56, 57, 58

Goodman v. Burlington Coat Factory Warehouse Corp.,
    292 F.R.D. 230 (D.N.J. 2013) .................................................... 53

Griffin v. Aluminum Co. of Am.,
    564 F.2d 1171 (5th Cir. 1977) (per curiam) .............................. 31

**Cases:**                                                                   **Page(s)**

*Gross v. S. Ry. Co.,*
    446 F.2d 1057 (5th Cir. 1971) ..................................................... 46

*Hernandez v. Acosta Tractors Inc.,*
    898 F.3d 1301 (11th Cir. 2018) ........................................... 32, 42

*Hill v. BellSouth Tel., Inc.,*
    364 F.3d 1308 (11th Cir. 2004) ........................................... 28, 29

*Home Design Servs., Inc. v. Turner Heritage Homes Inc.,*
    825 F.3d 1314 (11th Cir. 2016) .................................................. 46

*Hutchinson v. Florida,*
    677 F.3d 1097 (11th Cir. 2012) ................................................. 39

*In re Worldwide Web Sys., Inc.,*
    328 F.3d 1291 (11th Circ. 2003)................................................. 44

*Lavespere v. Niagara Mach. & Tool Works, Inc.,*
    910 F.2d 167 (5th Cir. 1990) ..................................................... 46

*Maddow v. Procter & Gamble Co.,*
    107 F.3d 846 (11th Cir. 1997) ................................................... 27

*Malautea v. Suzuki Motor Co.,*
    987 F.2d 1536 (11th Cir. 1993) ................................................. 32

*M.E.N. Co. v. Control Fluidics, Inc.,*
    834 F.2d 869 (10th Cir. 1987) ................................................... 40

*Nelson v. Am. Standard, Inc.,*
    No. 208-CV-390-TJW-CE, 2009 WL 4730166
    (E.D. Tex. Dec. 4, 2009)........................................................... 52

*Pearce v. Apfel,*
    205 F.3d 1341, 2000 WL 191841 (6th Cir. 2000)...................... 39

Cases:                                                                 Page(s)

*Roche Diagnostics Corp. v. Priority Healthcare Corp.*,
    No. 2:18-cv-01479-KOB-HNJ, 2021 WL 289597
    (N.D. Ala. Jan. 28, 2021) ...................................................... 43, 46

*Rodriguez v. Powell*,
    853 F. App'x 613 (11th Cir. 2021) (per curiam) ................... 43, 44

*\*Russell v. Gov't Emps. Ins. Co.*,
    787 F. App'x 953 (9th Cir. 2019) ...................................... ii, 59, 60

*Sanderlin v. Seminole Tribe of Fla.*,
    243 F.3d 1282 (11th Cir. 2001) ................................................ 27

*Sandlin v. Grand Isle Shipyard, Inc.*,
    No. CV 17-10083, 2018 WL 2065595
    (E.D. La. May 3, 2018) ............................................................ 52

*Scott v. Bimbo Bakeries USA, Inc.*,
    No. CIV.A. 10-3154, 2012 WL 6151734
    (E.D. Pa. Dec. 11, 2012) .......................................................... 52

*\*Searock v. Stripling*,
    736 F.2d 650 (11th Cir. 1984) ..................................30, 33, 35, 36

*SEC v. Johnson*,
    436 F. App'x 939 (11th Cir. 2011) (per curiam) ........................ 27

*SEC v. Merch. Capital, LLC*,
    483 F.3d 747 (11th Cir. 2007) ............................................ 28, 29

*Societe Internationale Pour Participations Industrielles et
Commerciales, S. A. v. Rogers*,
    357 U.S. 197 (1958) ................................................................ 32

Cases:                                                                    Page(s)

*Sutton v. Diversity at Work Grp. Inc.,*
    No. 1:20-CV-00682, 2021 WL 2334488
    (S.D. Ohio June 8, 2021) ............................................................ 52

*Thornton v. Hosp. Mgmt. Assocs., Inc.,*
    787 F. App'x 634 (11th Cir. 2019) .............................................. 32

*United States v. Milam,*
    855 F.2d 739 (11th Cir. 1988) ..................................................... 28

*Wellens v. Daiichi Sankyo Inc.,*
    No. C-13-00581-WHO (DMR), 2014 WL 7385990
    (N.D. Cal. Dec. 29, 2014) ............................................................ 53

*Zarnow v. City of Wichita Falls,*
    614 F.3d 161 (5th Cir. 2010) ....................................................... 46


Statutes:

28 U.S.C. § 1291 ................................................................................... 1

29 U.S.C. § 207 ................................................................................... 58

29 U.S.C. § 216 ................................................................................... 48


Rules & Regulations:

11th Cir. R. 34-3 .................................................................................. ii

*29 C.F.R. § 778.210 ................................................................. ii, 60, 61

Fed. R. App P. 34 ................................................................................. ii

Rules & Regulations:                                                        Page(s)

Fed. R. Civ. P. 54 ....................................................................... 45

Fed. R. Civ. P. 55 .............................................................. 2, 43

# I. <u>Statement of Jurisdiction</u>

In July 2018, William Heath Hornady, Christopher Miller, and Takendric Stewart brought this action against OTK alleging violations of the Fair Labor Standards Act (FLSA), 29 U.S.C. §§ 201, *et seq.*, and they added Alabama common-law claims via amendment two weeks later. (Docs. 1 & 5.) The district court had subject-matter jurisdiction under 28 U.S.C. §§ 1331 & 1367.

The district court conditionally certified the matter as a collective action under the FLSA (Doc. 93), and after opt-ins, all Plaintiffs (276 individuals, total)[1] purported to join their Alabama common-law claims to their FLSA claims as part of the same case. (Docs. 223 & 337.)

The district court entered final judgment against OTK and in favor of Hornady, et al. on October 4, 2022. (Doc. 410.) OTK timely filed a notice of appeal on October 28, 2022. (Doc. 413.) This Court has appellate jurisdiction. *See* 28 U.S.C. § 1291.

---

[1] For convenience, the original named Plaintiffs and the subsequent opt-ins (collectively, a total of 276 individuals) will be referred to as "Hornady, et al."

## II. <u>Statement of the Issues</u>

1.    Does the trial court abuse its discretion when entering a default judgment in excess of $13.1 million as a discovery sanction when there was no specific Order and no showing, before sanctions were announced, that it was "reasonably possible" for Defendant to produce documents as desired by Plaintiffs? Further, after the trial court removed Defendant's previous lead attorney from the case for making misrepresentations to the court, does the trial court's refusal to consider Defendant's evidence developed by new, non-conflicted counsel constitute an abuse of the trial court's discretion or cause "manifest injustice" to Defendant?

2.    Does a trial court err when it declines to consider whether or not Defendant has shown "good cause" to set aside the default before entering a final judgment in excess of $13.1 million as a discovery sanction? *See* Fed. R. Civ. P. 55(c).

3.    Does a trial court abuse its discretion when it enters, as a discovery sanction, a default judgment in excess of $13.1 million for since-remedied discovery deficiencies and finds facts contrary to the record in doing so?

4.    Does a trial court err when, for purposes of a default judgment, it accepts as true not only well-pleaded factual allegations but also erroneous legal conclusions in Plaintiffs' pleadings?

5.    Does a trial court err in entering default judgment in an amount not pleaded and not supported by "detailed affidavits" as required by the *Adolph Coors Co. v. Movement Against Racism & the Klan*, 777 F.2d 1538, 1544 (11th Cir. 1985)?

## III. <u>Statement of the Case</u>

### A.    <u>Nature of the Case</u>

Hornady, et al. are 276 current or former OTK employees. (Docs. 223, 373.) This action involves these 276 claimants, complex payroll systems and time-keeping data, and countless discrete discovery disputes. The facts of this case are inherently complex, and Hornady, et al., have exacerbated and leveraged that complexity at every turn. As the magistrate judge put it, Hornady, et al., consistently made "broad-ranging and shifting complaints regarding Defendant's production," which made "it difficult to pinpoint exactly what it is that the Plaintiffs have wanted the Defendant to produce." (Doc. 261, PageID 3275.)

When OTK tried to accommodate Hornady, et al.'s shifting discovery requests, Hornady, et al. then highlighted every inconsistency in the type of data being provided and accused both OTK and its payroll vendor of providing information that was "basically useless" and/or "garbage." (Doc. 216, PageID 2625-26; Doc. 242-3, PageID 2834; Doc. 303, PageID 3296.) Morever, Hornady, et al.'s redundant discovery requests had the consequence of making one deficient response to Hornady, et al.'s discovery requests look like many. Hornady, et al. thus created a discovery quagmire and then, against the backdrop of the confusion it caused, crafted discovery requests designed to manufacture discovery issues that would not have otherwise existed.

Against this backdrop, the district court ordered OTK to subpoena records from its own payroll vendor, ADP. (Doc. 229, PageID 2697.) OTK's counsel at the Littler Mendelson firm also represented ADP, but the Littler attorneys did not disclose this to OTK. (Doc. 303, PageID 3937; Doc. 388-8, PageID 5873.) And, to cap it off, OTK's Littler attorneys were then found to have misrepresented to the district court the extent to which ADP had actually responded to the subpoena. (Doc. 299, PageID 3705; Doc. 303, PageID 3937.)

Excusing past counsel's failings is not what this appeal is about. This appeal is about the appropriate consequences of those past failings; and it is about the propriety of the district court's decision to sanction since-remedied discovery deficiencies by entering default judgment in an amount not pleaded and in an amount lacking the type of evidentiary support required under this Court's precedent.

**B.    Statement of Facts and Procedural History[2]**

**1.    OTK's time-keeping system and pay practices.**

OTK manufactures stainless steel at a facility in Calvert, Alabama. In 2018, the year this action began, OTK paid its hourly mill workers, on average $67,964.26 per year. (Doc. 368-8, PageID 5874.) Hornady, et al. are individuals who currently are, or previously were, OTK manufacturing employees (mill workers) paid on an hourly basis. (Doc. 223, Page ID 2641.)

Generally speaking, OTK's non-exempt manufacturing employees work 12-hour shifts, with the shift change-overs taking place at 6:00 a.m. and 6:00 p.m. (*See, e.g.,* Doc. 363, PageID 5633-36 (for 30 members of the

---

[2] Because the facts and procedural history intertwine in this appeal of a default sanction, OTK addresses them together.

collective, selected alphabetically, 22 of them worked these rotating 6:00 a.m. to 6:00 p.m. shifts).) For purposes of calculating overtime, OTK started its 168-hour (seven-day) workweek at 6:00 a.m. on Sunday morning. OTK employees were informed of this in their Offer Letters and via OTK's August 2018 Team Member Handbook. (Doc. 202-2, PageID 2099; Doc. 368-8, PageID 5923-29.) That is also what members of the collective themselves have testified to. (Doc. 258-4, PageID 3200; Doc. 331, PageID 4314-19.)

OTK also typically paid its non-exempt manufacturing employees a bonus (also called a "production incentive") each month based on the realization of production goals set for the calendar month. (Doc. 223, PageID 2653.) OTK determines bonus eligibility and bonus size based on criteria fixed in advance, and those criteria can change only prospectively. (*Id.*) The dollar amount of the bonus is a percentage of each employee's gross pay (minus any bonuses) received during the calendar month for which OTK awards the bonus. (*Id.*) Thus, by definition, the percentage is calculated using both the regular pay and overtime pay employees receive during the bonus period.

### 2. Mr. Hornady files this lawsuit and obtains certification as a collective action.

In July 2018, approximately two months after OTK had reduced its automatic "rounding" on clock-in times from 30 minutes to seven minutes (Doc. 223, PageID 2642), Mr. Hornady and two others filed this lawsuit alleging a single claim under the FLSA. (Doc. 1.) That claim focused on allegations regarding OTK's practices of "rounding" employees' time-clock entries and also contained some non-specific allegations regarding OTK's bonus practices. (*See id.*, PageID 2-6.)

Mr. Hornady amended that Complaint two weeks later, and he amended it again in September 2018. (Docs. 5 & 45.) Both the First Amended Complaint and the Second Amended Complaint shared the same basic scope as the initial Complaint. They focused on allegations regarding the "rounding" of employee time and contain generalized allegations regarding the bonus. (Doc. 5, PageID 18-23; Doc. 45, PageID 355-60.) The principal substantive changes via these amendments were to add collective-action allegations and to join Alabama common-law claims with the FLSA claims. (*Id.*)

Mr. Hornady moved for conditional certification as a collective action. (Doc. 23.) The district court granted conditional certification.

(Doc. 93.) Eventually, between named Plaintiffs and opt-ins, 276 current or former OTK employees would participate in this action. (Doc. 373.)[3]

### 3. Discovery, discovery disputes, and Hornady, et al.'s requests for sanctions.

The parties filed their Rule 26(f) report in March 2019, thus officially beginning the discovery process. (Doc. 83.) Previously, OTK had, in October 2018, provided Mr. Hornady's counsel with .pdf versions of the time and pay records for 32 members of the collective. (Doc. 216, PageID 2469; Doc. 389-1, PageID 6231.)

Having already received time and pay records for 32 members of the collective, Hornady, et al. served a first set of discovery requests in April 2019. (Doc. 92.) When responses to these discovery requests were delayed, Hornady, et al. filed a "Motion to Strike Certain Affirmative Defenses and Motion to Compel Discovery Responses." (Doc. 96.) When OTK's Littler's attorneys missed the extended deadline to respond to that Motion, the district court, in July 2019, granted the Motion and ordered OTK to provide Hornady, et al. with the initial disclosures required in the Scheduling Order and to respond to Hornady, et al.'s first set of

---

[3] This count of 276 employees does not include individuals who opted-in but later withdrew their consents to participate in this action.

discovery requests. (Doc. 108, PageID 631.) The district court also sanctioned OTK by striking five of its affirmative defenses as "a sanction under Federal Rules of Civil Procedure 16(f)(1)(C)." (*Id.*)

In September 2019, Hornady, et al. filed a (second) Motion to Compel. (Doc. 146.) In this Motion, Hornady, et al. argued as follows:

> It is correct that Plaintiffs agreed to limit the pay and time records that needed to be produced before the mediation scheduled by the parties. There are now approximately 290 Plaintiffs and it would not be feasible (nor necessary) to have all of their pay/time records before mediation…. Because Section 5(e) of the Amended Scheduling Order (Doc. 137, Page ID. 840) requires Plaintiffs to file a motion to compel as to issues with the first set of discovery by September 13, 2019, Plaintiffs mention this issue so it is not (arguably) waived….

(*Id.*, PageID 929.) Ultimately, the district court denied Hornady, et al.'s (second) Motion to Compel as moot. (Doc. 205.)

Between February and April 2020, OTK produced Excel versions of pay and time records for 225 members of the collective, but as Hornady, et al. later pointed out, the 2020 Excel productions (unlike the previous .pdf production in October 2018) lacked a "pay rate" column in the pay records. (Doc. 216, PageID 2469; Doc. 389-1, PageID 6231-32.)

The district court held a discovery conference in March 2020. (Docs. 174 & 326.) Following that conference, the district court ordered

Hornady, et al. to make a submission regarding certain discovery disputes. (Doc. 180.) The district court eventually compelled production of what Hornady, et al. were seeking in some respects, but not others. (Doc. 182.)

### 4.    Another motion for sanctions.

In May 2020, the parties prepared a Joint Stipulated Order addressing their on-going discovery issues. (Doc. 207.) The district court entered that Stipulated Order. (Docs. 208 & 212.) Among other things, this Order required OTK "**[i]f reasonably possible**" to produce, for 11 named members of the collective, (1) "native and excel formats data files reflecting pay rates, start date and time, for each shift worked … from June 15, 2015 – present"; (2) "native and excel formats data files reflecting the colorized data that Defendant uses to show whether time is, or is not, authorized for payment, along with any comments"; and (3) "all documents and data reflecting the amounts, and underlying calculations of any 'trued up' payments from July 1, 2015 – present." (Doc. 212, PageID 2438-39 (emphasis added).) The Order also required the parties to meet and confer about production of the same data for the other 260-plus members of the collective. (*Id.*, PageID 2439.)

The next month, in June 2020, Hornady, et al. went "nuclear" over the discovery issues and filed a "Motion for Sanctions." (Doc. 216.) Hornady, et al. purported to lay out what they contended was a pattern of OTK's (1) failure to provide time and pay records despite Orders to produce those records and (2) misrepresentations about the data that had been produced. (*Id.*, PageID 2461-73.) They contended that pattern warranted drastic sanctions—default judgment both on Hornady, et al.'s FLSA claims and on their individual Alabama common-law claims. (*Id.*, PageID 2459-61.)

OTK, unsurprisingly, opposed the June 2020 Motion for Sanctions. (Doc. 220.) OTK, through its Littler attorneys, argued that there had been no bad-faith refusal to participate in discovery, and that it had, in fact, been producing the relevant time and pay data all along. (*Id.*, PageID 2263-64.)

Among other things, OTK's attorneys at Littler explained that the data Hornady, et al. wanted "is not all easily or readily available on one Excel document as Plaintiffs would like." (*Id.*, PageID 2624.) They explained that OTK had always relied on ADP for payroll, and it had relied on ADP's software for timekeeping since August 2017. (*Id.*) They

explained that it was ADP's system that created and maintained "Pay Statements," but even when OTK provided those to Hornady, et al.'s counsel, counsel claimed that those statements were not the information that he wanted (because they were not in Excel form). (*Id.*, PageID 2625-26.) As a result, OTK processed, instead, separate reports in Excel, but the new Excel reports—unlike the .pdf reports previously provided—did not include "pay rates." (*Id.*, PageID 2626.)

The district court denied Hornady, et al.'s request for sanctions without prejudice and ordered OTK to subpoena the requested information from ADP. (Doc. 229, PageID 2697.) That Order placed OTK in the position of acting as the official "middleman" between ADP and Hornady, et al.'s counsel, insofar as Hornady, et al. had never sought to subpoena records from ADP themselves. The district court ordered OTK to serve that subpoena by July 29, 2020. (*Id.*) And, OTK's Littler attorneys promptly filed a notice certifying that OTK had served ADP with a subpoena for the relevant information. (Doc. 230.)

On August 14, 2022, OTK informed Hornady, et al.'s counsel of the information that ADP could provide in response to the subpoena, which consisted of records in .pdf form. Counsel responded as follows: "I'm

unclear what pay information ADP would put in a 'standard output report' in PDF format. **I am very clear that PDFs are basically useless.**" (Doc. 242-3, PageID 2834 (emphasis added in the record below).)

### 5.    The Third Amended Complaint changes the scope of the lawsuit.

In the meantime, Hornady, et al. had moved for leave to file their Third Amended Complaint; the district court granted leave; and OTK answered the Third Amended Complaint. (Docs. 217, 221, 228.) The Third Amended Complaint, however, also added and spelled out two new legal theories about how OTK had underpaid Hornady, et al. overtime.

First, on OTK's bonus, Hornady, et al. argued, in effect, that OTK's percentage-based bonuses should be deemed "lump-sum" payments because "[t]he amount of the bonus was not included in the regular hourly rate from which the overtime pay rates were calculated." (Doc. 223, PageID 2653.) As was later revealed in the calculations Hornady, et al. ran, that allegation would have the effect of making their "regular rates of pay," on average, about $4.78 higher than the numbers OTK actually used when calculating employee overtime payments. (*See, e.g.,* Doc. 363, PageID 5646.) Thus, treating OTK's percentage-based payments as

lump-sums means that, for overtime hours (paid at time-and-a-half), Hornady, et al. are claiming that they are due an additional $7.17 (approximately) for every hour of overtime OTK previously paid them for.

Second, as to the workweek, Hornady, et al. effectively took it upon themselves to unilaterally re-define OTK's workweek. (Doc. 223, PageID 2647.) Although the Third Amended Complaint does not use the actual word "midnight," Hornady, et al. have argued that OTK may not use a shift start-time to begin its workweek and must start the workweek just after midnight, either on a Sunday or on a Monday. (Doc. 223, PageID 2647 (noting pay for OTK employees "is driven by the shift start time and day and not by the day of the week and time the employee works").)

However, the time and pay records produced in discovery show that OTK determined whether each employee worked more than 40 hours in a given workweek by looking at the hours the employee worked between the start of the Sunday morning shift at 6:00 a.m. (on most schedules) and the end of the Saturday evening shift at 5:59 a.m. (on most schedules) seven days later. (*See, e.g.,* Doc. 363, PageID 5633-36 (of the first 30 members of the collective, selected alphabetically, 22 of them worked rotating 6:00 am to 6:00 pm shifts).) That is what the Offer Letters in the

record show. (Doc. 368-8, PageID 5923-29.) That is what OTK's Team Member Handbook says. (Doc. 202-2, PageID 2099.) That is what members of the collective testified to. (Doc. 258-4, PageID 3200; Doc. 331, PageID 4314-19.)

But, by re-defining the workweek to always start at midnight, Hornady, et al. have been able to deny OTK credit for six or more hours of overtime pay that each member of the collective actually received in each workweek whenever he or she worked over a weekend. Reallocating these six hours to different workweeks may account for as much as 45% of the damages the members of the collective are claiming. (*See, e.g.,* Doc. 363, PageID 5639.)

It is the "lump-sum" treatment of OTK's percentage based bonus and the re-definition of OTK's workweek that served to increase the value of Hornady, et al.'s "best day" in court on their FLSA claims from approximately $2 million up to approximately $12.6 million. (*See, e.g.,* Doc. 406, PageID 6647; Doc. 410, PageID 6848.)

### 6.    Discovery and sanctions request redux.

In August 2020, Hornady, et al. filed a "Motion to Strike Defenses from Answer to Third Amended Complaint" and argued, *inter alia*, that

OTK had improperly re-asserted defenses to the Third Amended Complaint that had previously been stricken from OTK's Answer to the Second Amended Complaint. (Docs. 108 & 233.)

Moreover, the subpoena to ADP did not end Hornady, et al.'s discovery motions. Hornady, et al. filed a "Renewed Motion for Sanctions" in September 2020. (Doc. 238.) After briefing, the district court held a hearing on this Renewed Motion for Sanctions in October 2020. (Docs. 241 & 333.)

Meanwhile, the parties filed cross-motions for partial summary judgment. (Docs. 244 & 253.)

> **7. The magistrate judge issues Reports and Recommendations, and the sanctions question comes before the district judge.**

The magistrate judge issued a Report and Recommendation, recommending sanctions against OTK because the "failure to timely obtain information from ADP renders the payroll information it has produced unreliable." (Doc. 261, PageID 3274.) However, the magistrate judge tempered her sanctions recommendation with the following observation:

> The undersigned is persuaded that the current discovery impasse has been somewhat exacerbated by the Plaintiffs'

broad-ranging and shifting complaints regarding Defendant's production. Having presided over several discovery hearings in this matter, the undersigned has often found it difficult to pinpoint exactly what it is that the Plaintiffs have wanted the Defendant to produce.

(*Id.*, PageID 3275.)

Thus, the magistrate judge stopped far short of recommending a default judgment. (*Id.*) Instead, she concluded that the record showed that any discovery deficiencies were the result of mere negligence (and confusion caused by Hornady, et al.,'s broad-ranging and shifting complaints about OTK's productions) and found that lesser sanctions were sufficient to remedy those deficiencies. (*Id.*) She recommended following the framework of *Allen v. Board of Public Education for Bibb County*, 495 F.3d 1306, 1315-16 (11th Cir. 2007), which, in turn, had applied the Supreme Court's framework from *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687 (1946). (Doc. 261, PageID 3275-76.)

Not long thereafter, the magistrate judge also entered a Report and Recommendation on Hornady, et al.'s motion to strike OTK's affirmative defenses. (Doc. 277.) The magistrate judge recommended striking five of OTK's defenses because the court had previously struck five identical defenses as a discovery sanction. (*Id.*, PageID 3571-3572; *see also* Doc.

108, PageID 3271.) But, she recommended denying Hornady, et al.'s request to strike OTK's other affirmative defenses. (*See* Doc. 277, PageID 3572-74.) She reasoned that Hornady, et al. had shown no prejudice from the defenses' inclusion in the case and that summary-judgment motions were better suited to litigate the defenses' merits. (*Id.*, PageID 3573.)

All parties filed objections to the various Reports and Recommendations. (*See* Docs. 266, 267, 282, 286.) As part of its objections, OTK made the following revelation:

> Since the hearing with Judge Nelson on Plaintiff's motion (Doc. 238), Defendant continued its efforts to communicate with ADP about the "truing up" process that Ms. Pledger attempted to explain in her prior testimony. On November 3, 2020, ADP provided Defendant with a report "that looks back at the payroll of 10/11/2019" and asked for a telephone conference to discuss the report and the "regular rate of pay" process. Defendant coordinated a telephone conference to occur on November 5, 2020. During the November 5, 2020 conference, ADP explained the "regular rate of pay" process and the formula used to get the result to Ms. Pledger. In light of the information learned, Ms. Pledger needs to correct her prior testimony and Defendant is currently working on an affidavit to do so.

(Doc. 267, Page 3512.) The Littler attorneys, however, never obtained an affidavit like they said they would, and Ms. Pledger was not allowed to provide any explanation about her testimony until more than a year

later, after the default sanction had already been entered. (Docs. 328 & 329; Doc. 378, PageID 6048-49.)

Meanwhile, the status of the ADP subpoena and the documents that Hornady, et al. said they needed to calculate damages came to a head at a hearing held on all pending motions on February 17, 2021. (Docs. 278 & 299.) At that hearing, the following exchange took place between the district court and OTK's lead counsel at the time (Gavin Appleby with Littler):

> THE COURT: Okay. I don't need it [the previously-served ADP subpoena] right now…. I am happy to have a hearing about it, but I would be happier if they [ADP] would honor the order of this Court and respond to the subpoena.
>
> MR. APPLEBY: And we did send a subpoena to them at the time and I think we can tell them that you wouldn't have to have a hearing if this [the ADP production] pushes forward. So we will see what happens.

(Doc. 299, PageID 3705.)

Following that hearing, the district court entered two show-cause Orders relating to the documents OTK had subpoenaed from ADP. (Docs. 288 & 298.) The district court also entered an Order denying OTK's Motion for Partial Summary Judgment, stating that an opinion would follow. (Doc. 291.) No such opinion ever followed.

Before the show-cause hearing held on March 12, 2021, ADP filed a brief of its own and stated, in relevant part, as follows:

> Based on communications with [the Littler attorneys], ADP has always understood its efforts and production were sufficient, and never received any indication that there were any problems concerning ADP's efforts…. [N]ow that ADP has discovered the true status of these proceedings based on its recent independent review of the docket, ADP is shocked to learn what has been represented to the Court and believes that Defense Counsel – **as a result of their conflict of interest** – minimized the issues and their importance when communicating with ADP, led ADP to believe it was compliant with the Subpoena, and did not disclose the true nature and severity of the discovery problems in order to keep ADP happy as a firm client – all while leading the Court to believe that ADP was being unresponsive.

(Doc. 300, PageID 3792-93 (emphasis added).) At the time, the Littler attorneys did not furnish OTK with a copy of this court filing by ADP. (Doc. 368-8, PageID 5944-52.)

Then, at the show-cause hearing the next day on March 12, 2021, the district court first stated that the court was "not comfortable" with the "conflict issue" raised in ADP's briefing. (Doc. 303, PageID 3937.) However, the district court did not otherwise address that conflict issue, finding it "a client and lawyer issue." (*Id.*) Instead, what the district court found was that OTK's lead counsel at Littler had made

misrepresentations to the court and therefore revoked his *pro hac vice* admission:

> Mr. Appleby, you practice here on a pro hoc [*sic*] admission. I'm going to suspend that right now.... I'm not comfortable with what I think are -- with what I've heard from you today and at the other hearings and throughout the course of this case. I say I'm going to suspend your pro hoc [*sic*] admission.

(Doc. 303, PageID 3937.)

ADP then promptly began producing data (in Excel format, no less). (Doc. 304.) OTK (through its attorneys) agreed to pay ADP fees and costs in the amount of $63,668.02. (Docs. 312, 315, 317.) OTK, meanwhile, asked the district court to reconsider its denial of partial summary judgment. (Doc. 316.) The district court proceeded to conduct a pre-trial conference on April 13, 2021. (Docs. 311 & 318.) At this pre-trial conference, the district court announced:

> [A]lthough I am loath to enter a default as to liability, I don't think that there is any other recourse that I could take at this point in this case to address why we're here. *** So that's my intention is to enter an order of default against OTK as to liability and then we have to address the issue of damages.

(Doc. 318, PageID 4076-77.)

>    **8.    OTK replaces Littler with new, non-conflicted counsel, and the district court sanctions OTK with a default.**

Eight days after the April 2021 pre-trial conference, OTK terminated all of its Littler attorneys as counsel and replaced them with current counsel. (Doc. 319.) OTK stated that it believed Littler had a conflict of interest and could no longer represent OTK's interests. (*Id.*, PageID 4123.)

The district court allowed this substitution of counsel (Doc. 323), but denied OTK's new, non-conflicted counsel's request to file briefing regarding the additional sanctions mentioned at the April 2021 pre-trial conference. (Docs. 328, 329.) Thus, the only submission OTK was permitted to make at the time was a previously ordered "Joint List" with counsel for Hornady, et al. (Doc. 331.)

In November 2021, the district court formally entered the default it had threatened at the April 2021 pre-trial conference. (Doc. 344.) As part of this default, the district court found that OTK, when it was represented by Littler attorneys, "did not rebut the substantive, and substantial accusations [that] it had doctored and produced false records"

and "did not explain, at all, why it had refused to produce records it had previously agreed to provide." (*Id.*, PageID 4648.)

> **9.** **OTK pays attorneys' fees to Hornady, et al. and unsuccessfully seeks reconsideration of the default while the district court addresses damages.**

At this point, the case proceeded on three concurrent paths.

On the first path, OTK worked with Hornady, et al. OTK to stipulate to an amount of attorneys' fees to be awarded to Hornady, et al. for briefing the discovery issues that led to the default. (Doc. 345, 346.) As part of that, OTK paid $108,655.40 to Hornady, et al.'s counsel.

On the second path, OTK would file, in March 2022, a "Motion to Reconsider and Clarify the District Court's November 2021 and February 2022 Orders and Set Aside Default." (Doc. 369.) The briefing on this Motion was supported by, *inter alia*, Rule 30(b)(6) deposition testimony of ADP in a subsequent case (taken by OTK's new, non-conflicted counsel) and Declarations from OTK's Payroll Specialist, Melissa Pledger, and its Senior Vice-President for Human Resources, David Scheid. (Docs. 368-8, 378, 389-1, 396-1, 396-2.) OTK also submitted a Declaration from a labor economist explaining OTK's time and pay records. (Doc. 368-9; Doc. 369-9.)

On the third path, Mr. Hornady's counsel conferred with OTK and set before the district court the various disputes over how Hornady, et al. were to calculate damages following the district court's entry of default. (Docs. 348, 354, 360, 362, 363, & 406.) The district court also addressed the damages calculations at hearings held in December 2021, March 2022, and August 2022. (Docs. 344, 355, 398, 434, 435, & 442.) At no time did Hornady, et al. raise any issues that they lacked the data they needed to run such calculations. (Doc. 384; Doc. 406, PageID 6626 ("The parties stipulate that the calculations are derived from time and pay data of Plaintiffs' employment and / or reasonable estimates of such time and pay"); Doc. 442, PageID 8020 ("It was also around that time [of the April 13, 2022 hearing] that Mr. Rosenthal received – had received the complete ADP records that he said he needed to run all these calculations he's run.").)

### 10.   The district court enters a final judgment, and the parties appeal.

The district court never held a hearing on OTK's "Motion to Reconsider and Clarify the District Court's November 2021 and February 2022 Orders and Set Aside Default." (Doc. 369.) Based on the district court's subsequent Order (Doc. 409), the district court never considered

OTK's explanations that it was the Littler attorneys—and not OTK's managerial employees—who were responsible for OTK's purported discovery violations.  In fact, the district court did not consider even Hornady, et al.'s request in this regard that, *inter alia*:

> The Court require OTK to quickly make available for inspection and review all materials, emails, etc. about both its communications with Littler Mendelson and its own internal communications about this litigation (prior to the substitution of current counsel).

(Doc. 385, PageID 6217.)

Nor did the district court ever hold an evidentiary hearing on any matter concerning damages, as its various hearings on damages were limited to legal arguments and status updates only. (Docs. 434, 435, 442.) For that matter, Hornady, et al. ran their damage calculations without any Declaration from the person(s) running the calculations. (Doc. 406, PageID 6637, "Defendant maintains that no final judgment in this case should be entered until, at a minimum, Mr. Mroz provides a declaration and/or submits to cross-examination…."). Of course, Hornady, et al. had no problem getting such a Declaration when seeking fees and costs. (Doc. 415-4.)

The district court entered a Final Default Judgment on October 4, 2022 and denied OTK's request to set aside the default that same day. (Docs. 409, 410.) The district court awarded Hornady, et al. $13,171,958.56 in damages, of which $12,606,408.58 were for their FLSA claims certified as a collective action and $565,548.98 were for their 276 individual claims under Alabama "common law." (Doc. 410, PageID 6848.)

In awarding damages, the district court declined even to set-off roughly $334,000 that OTK had already paid to current employee members of the collective on their claims for overtime based on "rounding" because those payments—whose amounts were calculated before the district court had provided any instruction on calculating damages—"do not appear to comply with the Court's instructions on the methodology to calculate damages." (*Id.*, PageID 6848, n.2.)

OTK filed a notice of appeal on October 28, 2022. (Doc. 413.) Hornady, et al. filed a notice of cross-appeal on November 7, 2022. (Doc. 426.)

### C.    <u>Standards of Review</u>

For Issue Nos. 1 and 3, OTK seeks review of the district court's denial of its "Motion to Reconsider and Clarify the District Court's November 2021 and February 2022 Orders and Set Aside Default" (Doc. 369), which requested that the district court set aside the "non-final" default judgment imposed against it.  This Court reviews the denial of a motion to set aside a default judgment for abuse of discretion. *SEC v. Johnson*, 436 F. App'x 939, 940 (11th Cir. 2011) (per curiam). Likewise, it reviews the denial of a motion for reconsideration for abuse of discretion. *Sanderlin v. Seminole Tribe of Fla.,* 243 F.3d 1282, 1285 (11th Cir. 2001). Finally, it also reviews orders imposing sanctions (such as under Rule 37) for abuse of discretion. *Maddow v. Procter & Gamble Co.,* 107 F.3d 846, 853 (11th Cir. 1997).

However: "When reviewing an order striking a defendant's pleadings, our 'review should be particularly scrupulous lest the district court too lightly resort to this extreme sanction, amounting to judgment against the defendant without an opportunity to be heard on the merits.'" *Chudasama v. Mazda Motor Corp.*, 123 F.3d 1353, 1366 (11th Cir. 1997)

(quoting *Emerick v. Fenick Indus., Inc.,* 539 F.2d 1379, 1381 (5th Cir. 1976)).[4]

Issue No. 2 focuses on the legal standard that the district applied when denying the "Motion to Reconsider and Clarify the District Court's November 2021 and February 2022 Orders and Set Aside Default" (Doc. 369.) If the district court applied the incorrect legal standard to OTK's Motion, this Court's review is *de novo. SEC v. Merch. Capital, LLC*, 483 F.3d 747, 754 (11th Cir. 2007); *Hill v. BellSouth Tel., Inc.*, 364 F.3d 1308, 1314 (11th Cir. 2004).

Regarding Issue No. 4, when entering a Final Default Judgment against OTK, the district court accepted as true the allegations in the Third Amended Complaint regarding purely legal matters. OTK thus seeks review of the sufficiency of the Third Amended Complaint, which is reviewed *de novo. United States v. Milam*, 855 F.2d 739, 743 (11th Cir. 1988).

Finally, for Issue No. 5, OTK seeks review of the entry of the Final Default Judgment because its dollar amounts were not supported by

---

[4] Under *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981), decisions issued by the former Fifth Circuit on or before September 30, 1981 are binding precedents in this Court.

"detailed affidavits" and because the district court held no evidentiary hearing. The requirement, in *Adolph Coors Co. v. Movement Against Racism & the Klan*, 777 F.2d 1538, 1544 (11th Cir. 1985), of "detailed affidavits" is a matter of law, and therefore, the district court's decision not to require such affidavits, much less conduct a hearing, should also be reviewed *de novo. See Merch. Capital*, 483 F.3d at 754; *Hill*, 364 F.3d at 1314.

## IV. <u>Summary of the Argument</u>

This is an appeal of an unprecedented default judgment against OTK in excess of $13.1 million. After noting that this default sanction flowed from the misrepresentations of OTK's Littler attorneys and specifically making note of the Littler attorneys' conflict of interest where ADP was concerned, the district court refused to consider any evidence developed through new, non-conflicted counsel. In particular, the evidence developed through new counsel showed that it was impossible at the time to produce data in the precise form that Hornady, et al. had requested. This fact alone, under controlling law, makes a default

sanction inappropriate. *Searock v. Stripling*, 736 F.2d 650, 653 (11th Cir. 1984).

Further, the district court refused even to consider whether or not OTK, through its new, non-conflicted counsel, had shown "good cause" to set aside the default. That was an error of law which, standing alone, requires reversal and remand.

Hornady, et al. have now received the records that prompted their request for sanctions, and that evidence goes far beyond what is typical for discovery in FLSA collective actions. Those records contradict the pleading in the Third Amended Complaint. Thus, the default judgment reflects unrealistic damages that arise from accepting false factual allegations. That, too, requires reversal and remand.

Also, in determining the amount of the judgment, the district court improperly credited erroneous legal interpretations in the Third Amended Complaint. Among other errors of law, the district court interpreted 29 C.F.R. § 778.210 in a manner that unnecessarily complicates percentage-based bonuses in cases where the percentages are already calculated using employees' regular and overtime earnings.

This error of law requires reversal and, at minimum, a recalculation of damages following from the default.

Finally, the default judgment in excess of $13.1 million should be reversed because it is based on damage calculations that were not pleaded and were not supported by any evidentiary hearing or any "detailed affidavits," as required by *Adolph Coors Co. v. Movement Against Racism & the Klan*, 777 F.2d 1538, 1544 (11th Cir. 1985). Thus, even if the Court were to uphold the entry of default, the Court must remand for consideration of Hornady, et al.'s proof of their claimed damages in excess of $13.1 million.

# V. <u>Argument</u>

### A.  <u>The district court denied OTK's due-process rights by refusing to consider evidence developed through new, non-conflicted counsel when hitting OTK with a $13.1 million default judgment.</u>

So-called "death penalty" sanctions—default, dismissal, and the striking of a defendant's answer—are categorically more severe sanctions than any other sanctions a court may order. They are draconian sanctions of last resort. *See Chudasama v. Mazda Motor Corp.*, 123 F.3d 1353, 1371–72 (11th Cir. 1997); *Griffin v. Aluminum Co. of Am.*, 564. F.2d 1171,

1172 (5th Cir. 1977) (per curiam). They are, in fact, "the most awesome weapon" in a court's arsenal of sanctions. *Adolph Coors,* 777 F.2d at 1543. The use of such an awesome power has significant due-process implications. *See Societe Internationale Pour Participations Industrielles Et Commerciales, S. A. v. Rogers*, 357 U.S. 197, 208-12 (1958).

Because of those concerns, case-ending sanctions—default and dismissal—are different from other sanctions in at least three ways.

**First**, a default sanction requires more than just misconduct; it requires willfulness or bad faith. Before a court can impose default as an inherent-authority sanction, it must (complying with the mandates of due process) find that the sanctioned party engaged in subjective bad faith. *See Hernandez v. Acosta Tractors Inc.*, 898 F.3d 1301, 1306 (11th Cir. 2018). The same is true for sanctions under Rule 37. Courts must generally enter an order compelling the discovery before entering sanctions, *see Thornton v. Hosp. Mgmt. Assocs., Inc.*, 787 F. App'x 634, 638 (11th Cir. 2019), and the party must violate ***that*** order before a default can be entered. Further, the court must also find the failure to comply with the order compelling discovery was willful or in bad faith before it can enter a default or dismissal. *See id.* (citing *Malautea v.*

*Suzuki Motor Co.*, 987 F.2d 1536, 1542 (11th Cir. 1993)); *accord Chudasama*, 123 F.3d at 1371 ("Violation of a discovery order caused by simple negligence, misunderstanding, or inability to comply will not justify a Rule 37 default...."); *BankAtlantic v. Blythe Eastman Paine Webber, Inc.*, 12 F.3d 1045, 1049 (11th Cir. 1994) ("Our caselaw is clear that only in a case where the court imposes the most severe sanction—default or dismissal—is a finding of willfulness or bad faith failure to comply necessary."). Thus, "a party's inability to comply with a discovery order" cannot, standing alone, support a sanction of default or dismissal. *Searock v. Stripling*, 736 F.2d 650, 653 (11th Cir. 1984).

**Second**, courts cannot impose default as a sanction unless less draconian sanctions would be ineffective to ensure compliance and serve the interests of justice. If less severe sanctions would be effective, a court sanctioning with a default judgment abuses its discretion. *See Chudasama*, 123 F.3d at 1371 (reasoning that a court abuses its direction if it enters a default when "less draconian but equally effective sanctions were available" (quoting *Adolph Coors*, 777 F.2d at 1543).)

**Third**, district courts have less discretion to impose "death penalty" sanctions than they do to impose other sanctions:

> When, as here, a defendant's pleadings are stricken, an appellate court's review should be particularly scrupulous lest the district court too lightly resort to this extreme sanction, amounting to judgment against the defendant without an opportunity to be heard on the merits.

*Emerick v. Fenick Indus., Inc.*, 539 F.2d 1379, 1381 (5th Cir. 1976); *accord Chudasama*, 123 F.3d at 1366. Thus, as a matter of established law, a district court's imposition of "death penalty" sanctions does not receive the same deference on appellate review that any other lesser sanctions might.

When OTK moved to have the default sanction set aside, the district court concluded that Rule 54(b) required OTK to "set forth facts, or newly-available evidence, indicating the need to correct clear error or manifest injustice." (Doc. 409, PageID 6831.) That is not the controlling legal standard. (*See* section B., *infra*.) Yet, it is a standard that OTK actually met when it asked the district court to set aside the default.

What OTK had not done in discovery, up until the time of the district court's March 12, 2021 show-cause hearing (Doc. 303), was provide time and pay records for all 276 members of the collective in the format preferred by Hornady, et al. Instead, OTK had produced time and pay records for 225 members of the collective in .pdf and Excel formats,

and when ADP offered to do the same sort of .pdf production in response to OTK's subpoena, Hornady, et al.'s counsel said that this would be "basically useless." (Doc. 242-3, PageID 2834.) He also called many of the columns in the Excels he received "garbage." (Doc. 303, PageID 3296.)

In seeking reconsideration of the district court's default sanctions, OTK submitted the Declaration of its Payroll Specialist, Melissa Pledger, and its Senior Vice-President of Human Resources, David Scheid. Ms. Pledger detailed OTK's repeated attempts to provide Hornady, et al. with the data in the formats requested, whether directly or through ADP, and to obtain ADP's proprietary formulas on what Ms. Pledger had mistakenly termed a "true up." (Doc. 378, PageID 6045-54; Doc. 389-1, PageID 6229-34.) Mr. Scheid, for his part, also provided the district court with communications he had received from OTK's Littler attorneys at Littler. (Doc. 368-8, PageID 5944-52.)

Dismissing Ms. Pledger's Declarations, the district court explained: "Plaintiffs, again, demonstrate Defendant knew it agreed (and was ordered) to produce pay records, in Excel spreadsheets, with pay rates throughout the pendency of the action." (Doc. 304, PageID 3867.) The district court's analysis here fails to comply with the Eleventh Circuit's

*Searock* standard, insofar that there was never any evidentiary finding that Ms. Pledger—or anyone else at OTK—was able to obtain the data during the discovery period in the format Hornady, et al. desired. *See Searock*, 736 F.2d at 653.

In sanctioning OTK, the district court specifically found: "Defendant did not rebut the substantive, and substantial accusations, it had doctored and produced false records. Likewise, Defendant did not explain, at all, why it had refused to produce records it had previously agreed to provide." (Doc. 344, PageID 4648-49.) In response to this accusation, Ms. Pledger stated that she had merely run reports choosing columns with information requested by her attorneys. (Doc. 378, PageID 6045-54; Doc. 389-1, PageID 6229-34.) The district court here has never explained how choosing what columns to include when running reports can constitute "doctoring." The district court faulted OTK for failing to defend the allegations against it, but at the same time, the district court denied OTK the opportunity brief or argue sanctions issues using new counsel. (Docs. 328 & 329.) Ms. Pledger stated, in her Declaration obtained through new counsel, that she was eager to testify so as to "demonstrate [OTK's] good faith efforts and timely responses to requests

for information from Plaintiffs' counsel and from Littler." (Doc. 378, PageID 6046.) The district court never allowed her this opportunity.

Further, in discounting the Littler e-mails Mr. Scheid provided, the district court explained: "[I]n order to be properly before this Court on a motion to reconsider, these emails must be newly available evidence." (*Id.*, PageID 6842.) The district court concluded: "These declarations [of OTK employees] could have been produced before now, in response to any of Plaintiffs' various motions for sanctions or the R&R." (*Id.*, PageID 6843.). This is simply incorrect. At all times leading up to the issuance of sanctions, OTK was unknowingly represented by counsel operating under a conflict where ADP was concerned (*see* Doc. 303, PageID 3792), and those Littler attorneys did not keep OTK updated regarding developments in the case. It strains credibility to suggest that OTK's prior counsel would have provided Declarations or produced e-mails evidencing that counsel was withholding critical information from his own client. As a result, the district court's holding here represents a gross miscarriage of justice as to OTK.

In Mr. Scheid's Declaration, he specifically explained:

Littler did not disclose to me that its Firm also represented ADP, nor did Littler provide me with details related to the

> Court's accusations of untruthfulness regarding Littler's account of ADP's response to the subpoena. Once I learned of the Court's concerns, Littler's mutual representation of OTK and ADP, and counsel's representations to the Court regarding the ADP subpoena, I terminated Littler's representation of OTK and procured replacement counsel.

(Doc. 368-8, PageID 5873.) The e-mails attached to Mr. Scheid's Declaration confirm this. (*Id.*, PageID 5939-5948.) Because OTK's Littler attorneys were keeping OTK "in the dark" about what was happening and because the district court denied OTK's new counsel's request to brief the sanctions issue before entering sanctions (Docs. 328, 329), OTK's witnesses had no opportunity to provide their Declarations until OTK filed its "Motion to Reconsider and Clarify the District Court's November 2021 and February 2022 Orders and Set Aside Default." (Doc. 369.)

This is especially true given that, when OTK first retained non-conflicted counsel, OTK also requested leave to brief the sanctions issues before the district court formally entered sanctions against OTK. (Doc. 328.) The district court said "no." (Doc. 329.)

Regardless, OTK should not pay the price for the Littler's attorneys' unilateral misconduct. This Court's decision in *Byrne v. Nezhat*, 261 F.3d 1075 (11th Cir. 2001), *abrogated on other grounds by Bridge v. Phoenix Bond & Indemnity Co.*, 553 U.S. 639, 661 (2008), is instructive. There, a

district court dismissed a lawsuit as a sanction because the counsel intentionally filed a frivolous claim. This Court held that the district court's sanctions award was an abuse of discretion because the client was unaware of its counsel's misconduct—the client was in the dark. *See Byrne*, 261 F.3d at 1123. The Court reasoned:

> To support its findings of bad faith and otherwise sanctionable conduct, the court impermissibly relied solely on the actions of counsel. Sanctionable conduct by a party's counsel does not necessarily parlay into sanctionable conduct by a party.

*Id.* (citations omitted). Indeed, the attorney-client relationship is not like other principal-agent relationships, in that "most clients are not able to exercise perfect control over their lawyers." *Hutchinson v. Florida*, 677 F.3d 1097, 1109 (11th Cir. 2012) (Barkett, J., concurring). Thus, it is generally not appropriate to sanction a party for their counsel's offenses. *Donaldson v. Clark*, 819 F.2d 1551, 1557 n.6 (11th Cir. 1987); *accord Cmty. Dental Servs. v. Tani*, 282 F.3d 1164, 1168-69 (9th Cir. 2002) (collecting authorities); *Pearce v. Apfel*, 205 F.3d 1341, 2000 WL 191841, at *3 (6th Cir. 2000) (table) (stating the court "has been extremely reluctant to uphold the dismissal of a case ... merely to discipline an errant attorney because such a sanction deprives the client of his day in

court."); *M.E.N. Co. v. Control Fluidics, Inc.*, 834 F.2d 869, 873 (10th Cir. 1987) ("Where sanctions are concerned, ... we have cautioned that '[i]f the fault lies with the attorneys, that is where the impact of the sanction should be lodged.'" (citation omitted)). Here, despite a specific finding of misconduct by counsel, the district court gave OTK no opportunity to show its own good faith in this process.

The district court, in refusing to consider the Declarations offered by OTK's managerial employees, makes much of the confusion that Ms. Pledger had about the formatting of the .pdf files she produced in October 2018 (for 32 members of the collective) versus the formatting of the Excel files she produced in the winter-spring of 2020 (for 225 members of the collective). (*See* Doc. 389-1, PageID 6231-32.) The district court, however, never examined the witness or conducted any hearing over this formatting discrepancy. Nor did the district court follow Hornady, et al.'s suggestion of reviewing the Littler attorneys' instructions to Ms. Pledger about what reports to run. (Doc. 385, PageID 6217.) Instead, the district court denigrated the witness and maintained that she merely provided "a false, after-the-fact assertion." (Doc. 409, PageID 6836.) That, too, constitutes reversible error: "An imperfect witness is not the same thing

as a 'false' witness." *Flowers v. City of Detroit*, 306 F. App'x 984, 988 (6th Cir. 2009).

After disregarding the Declarations of OTK's managerial employees provided in support of OTK's "Motion to Reconsider and Clarify the District Court's November 2021 and February 2022 Orders and Set Aside Default" (Doc. 396), the district court then added: "The Court has previously rejected the notion that Defendant was an innocent victim of its former counsel." (Doc. 409, PageID 6844.) That is an odd statement, not least because the district court had previously stated on the record that the "actual misrepresentations of counsel" were what led to sanctions, as indicated by the following exchange between OTK's new counsel and the district court at a March 2022 hearing:

> MR. DOLIVE: … And the question is simply – there's – another issue is that there needs to be a cutoff at some point as to how many times Mr. Rosenthal needs to keep running numbers …. We would like April [2021] just because that seems clear, based on the sanctions, and it's not a continuing conduct.

> THE COURT: Okay. Well, certainly, **the sanctions is not just for discovery violations. I mean, it's the actual misrepresentations of counsel. There's certainly more to it than a discovery sanction**….

(Doc. 442, PageID 8020-21 (emphasis added).)

In sum, the district court abused its discretion when it refused to hear OTK's arguments and evidence (untainted by the Littler attorneys's inactions and undisclosed conflict) *before* entering the default and further abused its discretion when it refused, *after* entering default, to hear OTK's evidence because that evidence was supposedly not "newly-available evidence." (Doc. 409, PageID 6831.) OTK had no means of showing that its own conduct (versus the conduct of its Littler attorneys) was not "willful" and not in "bad faith," *see Hernandez*, 898 F.3d at 1306, until its former counsel was removed from the equation.

## B. The district should have applied a "good cause" standard to set aside the default, and the district court's refusal even to consider whether or not OTK had shown "good cause" requires reversal.

The district court began its analysis of the "Motion to Reconsider and Clarify the District Court's November 2021 and February 2022 Orders and Set Aside Default" (Doc. 396) with the following analysis of the legal standard it would apply: "Though the Eleventh Circuit has provided some guidance on the procedural use of a nonfinal default judgment, it has not spoken directly as to which standard to apply when reconsidering this type of order." (Doc. 409, PageID 6829.) After pages of analysis, the district court decided that Rule 55(c)'s "good cause"

standard did not apply and instead announced its intention to rely on the standard set forth in on *Roche Diagnostics Corp. v. Priority Healthcare Corp.*, No. 2:18-cv-01479-KOB-HNJ, 2021 WL 289597 (N.D. Ala. Jan. 28, 2021). (*Id.*, PageID 6829-31.) Purporting to apply *Roche*, the district court held that "the Rule 55(c) 'good cause standard' is not applicable to defendants who have appeared and been sanctioned, as opposed to those who have failed to appear or defend." (*Id.*, PageID 6831.)

One problem, however, is that the *Roche* case does not say what the district court said it says. Instead, the *Roche* court concluded its own analysis by expressly observing: "The Defaulted Defendants have given the court no just reason to set aside its default judgment." *Id.*, 2021 WL 289597, at *5. The *Roche* court's "no just reason" standard is, effectively, Rule 55(c)'s "good cause" standard. *See* Fed. R. Civ. P. 55(c). So, the district court's conclusion that "good cause" is not the controlling standard was error. That requires reversal and remand.

In applying the "good cause" standard, relevant considerations include whether the default was the result of culpable or willful conduct, prejudice to the adverse party, the existence of a meritorious defense, and the strong policy in favor of determining cases on their merits. *Rodriguez*

*v. Powell*, 853 F. App'x 613, 615-16 (11th Cir. 2021) (per curiam) (citing *In re Worldwide Web Sys., Inc.*, 328 F.3d 1291, 1295 (11th Circ. 2003) and *Compania Interamericana Exp.-Imp., S.A. v. Compania Dominicana de Aviacion*, 88 F.3d 948, 951 (11th Cir. 1996).)   Taken together, "the defaulting party … must offer a 'satisfactory reason' to set aside the default." *Rodriguez v. Powell*, 853 F. App'x at 616 (citing *African Methodist Episcopal Church, Inc. v. Ward*, 185 F.3d 1201, 1202 (11th Cir. 1999).)

Here, considering all the circumstances, OTK had shown ample "good cause" for the district court to vacate its entry of default. Among other reasons:

- The discovery violations were caused by former counsel, who did not keep OTK informed of the district court's discovery rulings and was operating under an undisclosed conflict of interest with ADP (Doc. 303, PageID 3937; Doc. 368-8, PageID 5873);

- The discovery violations at issue have now been fully cured, and Hornady, et al. have all the Excel-format data they have

requested (Doc. 384; Doc. 406, PageID 6626; Doc. 442, PageID 8020); and

- Valid explanations for why the OTK could not have provided all time and pay records in the Excel format Hornady, et al. preferred were provided through deposition testimony from ADP and Declarations from OTK's managerial employees. (Docs. 368, 378, 389, 396.)

Further, whatever can be said about Rule 55(c)'s "good cause" standard, Rule 54(b) still provides the district court with plenary authority to vacate its default at any time before final judgment enters. *See* Fed R. Civ. P. 54(b). The district court here concluded that Rule 54(b) required OTK to "set forth facts, or newly-available evidence, indicating the need to correct clear error or manifest injustice." (Doc. 409, PageID 6831.) That was legal error. Although the Eleventh Circuit does not appear to have issued a binding decision delineating the bounds of when a district court may exercise that discretion under Rule 54(b), other circuits have held that a district court's power to revisit an interlocutory decision is plenary—it is "free to 'reconsider and reverse its decision for any reason it deems sufficient, even in the absence of new evidence or an

intervening change in or clarification of the substantive law.'" *Zarnow v. City of Wichita Falls*, 614 F.3d 161, 171 (5th Cir. 2010) (quoting *Lavespere v. Niagara Mach. & Tool Works, Inc.*, 910 F.2d 167, 185 (5th Cir. 1990)); *cf. Home Design Servs., Inc. v. Turner Heritage Homes Inc.*, 825 F.3d 1314, 1327 (11th Cir. 2016) ("[T]he district court's change of heart between summary judgment and judgment as a matter of law is equally irrelevant. A 'prior denial of summary judgment does not rule out the possibility of a subsequent directed verdict.'" (quoting *Gross v. S. Ry. Co.*, 446 F.2d 1057, 1060 (5th Cir. 1971)).

In sum, the district court committed legal error when it relied on *Roche,* 2021 WL 289597, as grounds for refusing to consider OTK's evidence submitted in support of its "Motion to Reconsider and Clarify the District Court's November 2021 and February 2022 Orders and Set Aside Default" (Docs. 369, 378, 389, 396), and for refusing to consider whether or not OTK had shown "good cause" for setting aside the default. Coupled with the district court's refusal to allow OTK's non-conflicted counsel the opportunity even to brief the sanctions issue before the district court entered sanctions (Doc. 329), the district court's refusal to

hear OTK's "good cause" arguments on reconsideration results in manifest injustice and depravation of OTK's due-process rights.

**C.    The discovery sanctions are inappropriate and denied OTK due process because Hornady, et al. have now received the missing evidence prompting their request for sanctions, and further, that evidence goes far beyond what is typical for discovery in collective actions and contradicts the pleading in the Third Amended Complaint.**

The magistrate judge's recommendation was that Hornady, et al. apply the framework of *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687 (1946), and *Allen v. Board of Public Education for Bibb County*, 495 F.3d 1306, 1315-16 (11th Cir. 2007), for when an employer's time and/or pay records are not available in an FLSA case. (Doc. 261, PageID 3275-3276.) However, even this *Mt. Clemens* framework is no longer appropriate now that Hornady, et al. have all the time and pay data they sought from OTK (and, indirectly, from OTK's payroll provider ADP). (Doc. 384; Doc. 406, PageID 6626; Doc. 442, PageID 8020.) Moreover, the district court ultimately rejected the magistrate judge's reliance on *Mt. Clemens* and instead entered default against OTK as to liability. (Doc. 344, PageID 4650.)

This case is now in a very different posture than when, for example, Hornady, et al. filed their "Miscellaneous Court-Ordered Submission About Remaining Discovery Deficiencies" (Doc. 279) in February 2021 (when Littler still represented OTK). In that submission, Hornady, et al. alleged that (1) they did not have any time or pay information for the last year (relevant to at least 100 members of the collective); (2) there were 26 members of the collective for whom OTK had no time or pay records; and (3) there were 20 members of the collective for whom OTK had failed to produce some time or pay records.  (Doc. 279, PageID 3578-79.) None of that is at issue now. That was all cured around the same time and/or after OTK retained new counsel. (Doc. 384; Doc. 406, PageID 6626; Doc. 442, PageID 8020.)

The district court was obligated to consider sanctions less drastic than default. *EEOC v. Troy State Univ.*, 693 F.2d 1353, 1358 (11th Cir. 1982). In terms of potential lesser sanctions, which the district court awarded but apparently found insufficient standing alone, the FLSA allows liquidation (doubling) of damages in place of prejudgment interest, and allows damages to go back three years (rather than two years) in cases of "willful" violations. 29 U.S.C. § 216(b). Allowing Hornady, et al.

to go back three years for any damages and to double the amount of the damages are ample deterrents to other employers who might be tempted to adopt the strategy followed by OTK's Littler attorneys in this case. Notably, the FLSA aspects of the district court's judgment in excess of $13.1 million already include liquidated damages and the three-year look-back—OTK's contention in this appeal is not only that a default on liability should not have been entered at all, but also that, once liability is found, the district court could, as a sanction, have awarded liquidated damages and applied the three-year look-back.

Similarly, the district court has already sanctioned OTK with an attorneys' fee award, and OTK has paid Hornady, et al.'s counsel $108,655.40. (Doc. 346.) That is in addition to the $63,668.02 that OTK (through its Littler attorneys) also paid to ADP in fees and costs. (Docs. 312, 315, & 317.)

Moreover, OTK has stated that it would be prepared to pay out twice the amount that Hornady, et al. would have received in additional overtime if OTK had not had any "rounding" in its time clocks. That was the claim originally at issue in the original Complaint, the First Amended Complaint, and the Second Amended Complaint (Docs. 1, 5, 45), and such

claims are generally fact-intensive. *See, e.g., Aguilar v. Mgmt. & Training Corp.*, 948 F.3d 1270, 1289 (9th Cir. 2020) (overruling a the district court's grant of an employer's summary judgment motion and explaining, "we are concerned with whether MTC compensates [the officers] for work completed outside of those eight-hour shifts. And if the ten-minute adjustment rule routinely rounds off that compensable overtime, as the officers' evidence suggests, then the officers' rounding theory remains viable."). In fact, when stating the issues to be resolved in the case, OTK put the questions as this: "did each Plaintiff and each Collective member perform work after clocking in but before the scheduled start of his or her assigned shift?" and "did each Plaintiff and each Collective member perform work after the scheduled end of his or her assigned shift but before clocking out?" (Doc. 331, PageID 4305-09.)

Had OTK been paying Hornady, et al., on a minute-to-minute basis, from clock-in to clock-out, going back three years from when each member of the collective opted in to this lawsuit, double this amount would be $1,954,614.03. (Doc. 406, PageID 6647; Doc. 407-11.) OTK has further shown these figures for each of the 276 members of collective. (Doc. 407-11.)

Also, 126 members of the collective have already received the combined amount of $334,045.58 in the spring of 2022 as a voluntary payment OTK made to current employees. (Doc. 435, PageID 7883-7884.) Hornady, et al.'s counsel stated that this amount had been "Not just tendered, but, like, auto deposited and cashed." (*Id.*, PageID 7883.) The district court named this $334,045.58 "early payments," but incredibly denied OTK any "credit" or "set-off" for these "early payments" on grounds that they "do not appear to comply with the Court's instructions on the methodology to calculate damages." (Doc. 410, PageID 6848, n.2.) However, the reason these payments did not comply with the district court's "instructions on the methodology" here was not any malfeasance (much less willfulness or bad faith) but simply because the amounts had been calculated as of January 2022. (Doc. 435, PageID 7883.) That was before the district court provided its "instructions on the methodology to calculate damages" in March 2022. (Doc. 366.)

For that matter, imposing the sanction of default because OTK had not produced time and pay records for all 276 members of the collective before the district court's show-cause hearing on March 12, 2021 is disproportionate and contrary to the purposes of the FLSA. It should not

51

be lost that OTK, in October 2018, provided time and pay records for 32 members of the collective. (Doc. 216, PageID 2469; Doc. 389-1, PageID 6231.) In FLSA collective actions, courts routinely limit discovery "to a representative sample of opt-in plaintiffs in FLSA actions." *Scott v. Bimbo Bakeries USA, Inc.*, No. CIV.A. 10-3154, 2012 WL 6151734, at \*5 (E.D. Pa. Dec. 11, 2012); *accord Sandlin v. Grand Isle Shipyard, Inc.*, No. CV 17-10083, 2018 WL 2065595, at \*10 (E.D. La. May 3, 2018) ("[R]epresentative discovery and testimony is frequently permitted in FLSA collection [*sic*] action[s]"); *Nelson v. Am. Standard, Inc.*, No. 208-CV-390-TJW-CE, 2009 WL 4730166, at \*2–3 (E.D. Tex. Dec. 4, 2009) (limiting discovery to named plaintiffs and randomly selecting seven percent of opt-in class of FLSA party plaintiffs). Limiting discovery to a representative sample of the opt-in class is proper and preferable, and it serves the purposes of the collective-action mechanism. *See, e.g., Sutton v. Diversity at Work Grp. Inc.*, No. 1:20-CV-00682, 2021 WL 2334488, at \*3 (S.D. Ohio June 8, 2021) (finding that numerous courts have recognized the value of "statistically significant samples" in FLSA cases).

On the other hand, courts typically hold that expanding the scope of discovery to all opt-ins undermines the purpose and utility of collective

actions. *See, e.g., Cranney v. Carriage Servs., Inc.*, No. 2:07-CV-01587-RLHPAL, 2008 WL 2457912, at *3 (D. Nev. June 16, 2008) (authorizing discovery of 10% of opt-ins and observing that to permit the "full scope of discovery authorized by the Federal Rules of Civil Procedure would undermine the purpose of conditionally certifying a collective action and would be unreasonably burdensome and wasteful of the parties' and the court's resources."); *see also Wellens v. Daiichi Sankyo Inc.*, No. C-13-00581-WHO (DMR), 2014 WL 7385990, at *3 (N.D. Cal. Dec. 29, 2014); *Goodman v. Burlington Coat Factory Warehouse Corp.*, 292 F.R.D. 230, 234 (D.N.J. 2013). In this case, the district court's requirement that OTK produce all its time and pay records (in Excel format, no less) for all 276 members of the collective undermines the utility and purpose of a collective action.

Here, Hornady, et al. never argued that OTK had failed to produce all time and pay documents for a statistically-significant representative sample of the collective at the time they filed their June 2020 "Motion for Sanctions and/or Related Motion to Compel," a Motion which Hornady, et al. later "renewed" in September 2020. (Docs. 216, 238.) If Hornady, et al. had been running their damage calculations using a representative

sample, the need for Excels (as opposed to the .pdf files originally produced) would not have been nearly as acute as in the case of Hornady, et al.'s attempt to run damage calculations 276 separate times.

In short, had the district court managed Hornady, et al.'s unfettered demands for discovery on all 276 members of the collective in accordance with how FLSA collective actions are typically handled, this case would never have gotten to its present, highly unusual state.

The fact that this is now no longer an FLSA collective action but instead an action with 276 individual plaintiffs is confirmed by the district court's February 2022 Order addressing the "unjust enrichment" claims at common law. (Doc. 351, PageID 4757-60.) Those non-FLSA claims were never certified for collective treatment, and Count II of the Third Amended Complaint purports to bring claims on behalf of "All Plaintiffs." (Doc. 223, PageID 2657-58.) Thus, the district court's entry of default (Doc. 344) has effectively converted the case from an FLSA collective action into an action with 276 individual plaintiffs.

For that matter, the damage calculations of over $13.1 million run by Hornady, et al. assume material facts contradicted by the underlying records. The most common shift assignment for hourly employees were

54

rotating six-to-six shifts, and for these employees, OTK consistently used a workweek that began at 6:00 am Sunday and ran to 5:59 am the following Sunday. (*See, e.g.,* Doc. 363, PageID 5633-36 (of the first 30 members of the collective, selected alphabetically, 22 of them worked rotating 6:00 am to 6:00 pm shifts).) That is what the Offer Letters in the record show.  (Doc. 368-8, PageID 5923-29.)  That is what OTK's Team Member Handbook says.  (Doc. 202-2, PageID 2099.)  That is what members of the collective testified to. (Doc. 258-4, PageID 3200; Doc. 331, PageID 4314-19.) That is what OTK's time and pay data, as analyzed by labor economist Dr. Amidon-Johansson shows. (Doc. 368-9, PageID 5957; Doc. 396-6, PageID 6556.)

Further, Dr. Amidon-Johansson's analysis demonstrates that Hornady, et al. never actually needed the "the colorized data that Defendant uses to show whether time is, or is not, authorized for payment." (Doc. 208, DocID 2428.) Hornady, et al. already themselves put into the record collective member Colin Hartery's "Earnings Statements." (ECF No. 244-10.) Dr. Amidon-Johansson compared the total hours shown on these "Earning Statements" with what was shown in ADP's time-clock data, starting the seven-day workweek with the 6:00

a.m. shift on Sunday morning.  (ECF No. 368-9, PageID 5957; ECF No. 396-6, PageID 6556.) That analysis shows exactly how many hours of overtime Mr. Hartery was approved for (and paid) during a pay period.

Ignoring this analysis entirely, the district court accepted Hornady, et al.'s self-serving re-definition of the workweek with no basis in fact. The district court, instead, through its default judgment, effectively required that OTK start every workweek at midnight. The FLSA does not require this. The law does not require that all workweeks start at midnight on Sunday or Monday; this is not what OTK's records provided to Hornady, et al. actually show; and this should not have been accepted as part of the default judgment. That abuse of discretion alone requires reversal and remand.

**D.    The district court erred when interpreting the law governing FLSA claims and improperly credited erroneous legal interpretations in the Third Amended Complaint.**

In a recent decision in a companion case brought by the same counsel who represents Hornady, et al., the same district court judge as in the present action entered summary judgment in favor of plaintiff on OTK's same monthly "bonus" plan at issue here. *See Gibson v. Outokumpu Stainless USA, LLC*, No. 21-00103-JB-N, 2023 WL 2604812

(S.D. Ala. Mar. 22, 2023).[5] In *Gibson*, the district court found that OTK's percentage bonus was not entitled to be treated as a percentage bonus under 29 C.F.R. § 778.210 because the percentage was calculated using the "wages paid" during the month in which the bonus was earned instead of using the wages attributable to the "hours worked" during the month in which the bonus was earned. *Id.* at *5.

The *Gibson* court then explained the governing law as follows: "A percentage bonus that pays a percentage on earnings not earned during the bonus calculation period is not a permissible percentage bonus because it fails to recalculate the regular rate of pay of the overtime incurred / worked during the bonus calculation period." *Id.* at *9.

That interpretation followed the same explanation that Hornady, et al.'s counsel offered in this case; he argued that OTK should have calculated "the bonuses based on how much money the person really did earn from January 1st through January 31st, **not how much they were paid**." (Doc. 442, PageID 8017 (emphasis added).) But, Hornady, et al.'s attempt to draw a distinction between (1) the amount of money a "person

---

[5] This *Gibson* Order is the type of Order that the district court promised here (Doc. 291), but never followed through on.

really did earn" in a given month and (2) the money a person was "paid" in that same month is not a distinction found in the FLSA. That this argument is flawed is demonstrated by the fact that in the *Gibson* case, the single plaintiff in that case was paid $576.46 under OTK's calculation than under the method he was proposing. *See Gibson v. Outoumpu Stainless USA, LLC*, No. 21-00103-JB-N, July 21, 2022 Brief, ECF No. 100, PageID 2830. Undeterred by this salient fact, the district court awarded Mr. Gibson summary judgment on his bonus claim and found that OTK's bonus violated the FLSA. *See Gibson*, 2023 WL 2604812, at *9. Similar arguments were also raised in this case. (*See, e.g.,* Doc. 331, PageID 5945.)

Whether or not Hornady, et al. would be paid more or less in bonuses if the bonus percentages were applied to the hours worked versus the pay received in the bonus month, for employees who work rotating hourly shifts and who are not paid on set monthly salary, the amounts paid on the hours worked in a month will almost always differ from the amount of pay the employee actually receives during the same month. That difference, however, does not matter under the FLSA. The FLSA does not dictate the manner in which an employer awards a bonus.

The statute only requires that the non-discretionary bonus payments be considered when calculating the amount of overtime each employee receives. 29 U.S.C. § 207(e).

Here, OTK pays a production incentive (a form of bonus) whose dollar amount is calculated by applying a defined percentage to the total wages paid during the same month the bonus is earned. So, if it is announced in advance that, if certain production metrics are met in February, a 20% percent bonus will be earned for February, OTK's hourly employees will receive a 20% bonus on all wages (including vacation wages, regular wages, and overtime wages) paid to them during the month of February. Because it is not possible, until after the end of February, to determine whether February production metrics have, in fact, been met, OTK pays its bonus in the month after the bonus is earned (i.e., the February bonus is paid in March). But, the bonus is always calculated as a percentage of total wages each hourly employee receives during the month in which the bonus is earned (i.e., in this example, the month of February).

Because the bonus constitutes a percentage of regular and overtime pay received by the employee during the month, it squarely falls within

29 C.F.R. § 778.210. The FLSA does not regulate OTK's decision to pay its bonus as a percentage of an employee's earnings based on paychecks received in a given month, rather than as a percentage of employees' earnings based on hours actually worked in a given month. Instead, the FLSA requires only that, if the bonus is calculated as a percentage of the employee's pay, an equal percentage of both regular and overtime pay must be included in the percentage calculation. 29 C.F.R. § 778.210.

For example, in *Russell v. Government Employees Insurance Co.*, 787 F. App'x 953 (9th Cir. 2019), the court examined the following bonus: "GEICO calculated employee cash payments and trust contributions as a percentage of the employee's 'Total Earnings' in a calendar year, which included regular wages, overtime earnings, and other bonuses." *Id.* at 954. There is no indication in *Russell* that the referenced "Total Earnings" for the year were based on hours actually worked in the year, versus the paychecks received in that year.

Similarly, *Barragan v. Home Depot U.S.A., Inc.*, No. 3:19-cv-01766, 2021 WL 3634851 (S.D. Cal. Aug. 17, 2021), explains:

> [A]n employer is not liable for additional overtime pay when they offer "percentage-based bonuses." A "percentage-based bonus" is one in which the employer will award a bonus calculated as a percentage of an employee's total wages

(regular pay plus overtime pay). If an employer grants a bonus to an employee as a percentage of total pay, the employer increased both the regular rate of pay and the bonus pay by the same percentage. Under a "percentage-based bonus," there is no need for an employer to recalculate the regular rate on which overtime pay must be based, because the employer has already accounted for an increase in overtime pay.

Here, OTK's production incentives meet all the requirements of "percentage-based bonuses" described by the *Barragan* court. Nowhere does *Barragan* state that the percentage-based bonus must cover the total pay earned over the time period during which the employees work the hours, rather than amounts actually paid to employees during the same time period.

Instead, to satisfy § 778.210, the bonus must simply constitute the same percentage of both regular and overtime pay for the same period of time. Thus, the *Barragan* court found that Home Depot did not award a "percentage-based bonus" under § 778.210, not because the bonus did not cover the total period of time in which it was earned, but because it was a $100 payment and not a percentage of regular and overtime pay. *Barragan*, 2021 WL 3634851, at *6. At the risk of stating the obvious, a bonus cannot be "percentage-based" when it is a flat $100 payment. But, that is not OTK's bonus.

For that matter, it is not just the "bonus" claims under the FLSA that are wrong as a matter of law. Were it not for the striking of OTK's Answer (and, in particular, its Sixteenth Defense—*see* Doc. 228, PageID 2693), the individual state-law claims brought by all 276 members of the collective for the "regular rate" hourly pay on minutes "rounded" in weeks in which they worked fewer than 40 hours would be preempted by the FLSA. *See Bujalski v. Kozy's Rest., Inc.*, No. 7:13-CV-01446-MHH, 2017 WL 57344, at \*5 (N.D. Ala. Jan. 5, 2017). The *Bujalski* court noted that because each plaintiff's claim was "premised" on the defendant's "alleged failure to compensate the plaintiffs for their work at Kozy's—a requirement imposed by the FLSA—the FLSA preempts the plaintiffs' state law claims." *Id.* To join 276 individual Plaintiffs into a single action without following Rule 23 and without ever once considering the issue of federal preemption of 276 joined state-law claims is also reversible error that calls for remand.

**E.    The Final Default Judgment should be reversed because it is based on damage calculations that were not pleaded and were not supported by any "detailed affidavits."**

Hornady, et al.'s complicated approach to damages is underscored by their failure to present any affidavits backing their damage

calculations—calculations that were, in large part, performed by Hornady, et al.'s counsel. Under *Adolph Coors Co. v. Movement Against Racism & the Klan*, 777 F.2d 1538, 1544 (11th Cir. 1985), a default judgment must be supported by "detailed affidavits," but Hornady, et al.'s calculation of $13,171,958.56 in damages here was not supported by any affidavit, much less a "detailed" one.

In terms of additional information that would be needed in order to complete the record, OTK notes that, in separate litigation, Hornady, et al.'s counsel provided a letter from computer programmer Jeff Mroz (Doc. 407-6), and this letter purports to describe how Mr. Mroz wrote computer programs to conduct calculations in the present action. (Doc. 406, PageID 6637-38.) No final judgment in this case should have been entered until, at a minimum, Mr. Mroz provided a declaration and/or submitted to cross-examination regarding the computer programs that he wrote (and did not write) in the present matter and the calculations performed by those computer programs. As it is, OTK is currently subjected to a judgment in excess of $13.1 million, when (1) this amount is unsubstantiated by affidavits or any record testimony, when (2) the unsubstantiated calculations do not consider the workweek actually and

lawfully used by OTK, when (3) the unsubstantiated calculations incorrectly assume that OTK's percentage-based bonuses were actually "lump-sum" payments, and when (4) the unsubstantiated calculations do not give OTK any credit at all for the roughly $334,000 already paid to members of the collective on their "rounding" claims.  This, too, is reversible error.

## VI. <u>Conclusion</u>

OTK respectfully asks that this Court reverse the district court's entry, as a discovery sanction, of a default judgment against OTK in an amount in excess of $13.1 million and remand this case to the district court with instructions to resolve the case on the merits.

Respectfully submitted,

*s/ Devin C. Dolive*
One of the Attorneys for
Appellant–Cross-Appellee
Outokumpu Stainless USA, LLC

<u>OF COUNSEL</u>
Devin C. Dolive
BURR & FORMAN LLP
420 North 20th Street
Suite 3400
Birmingham, Alabama 35203
(205) 251-3000
ddolive@burr.com

50579712 v1                    64

Cheri Turnage Gatlin
BURR & FORMAN LLP
190 East Capitol Street
Suite M-100
Jackson, Mississippi 39201
(601) 709-3444
cgatlin@burr.com

No. 22-13691

*William Hornady, et al. v. Outokumpu Stainless USA, LLC*

## **Certificate of Compliance**

This brief complies with the type-face requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6). The brief is in 14-point Century Schoolbook, which is a proportionately spaced font that includes serifs.

This brief complies with the type-volume limitations in Federal Rule of Appellate Procedure 32(a)(7)(B)(i) because it contains 12,908 words, excluding the parts of the brief that are exempt under Federal Rule of Appellate Procedure 32(f).

*s/ Devin C. Dolive*
OF COUNSEL

No. 22-13691

*William Hornady, et al. v. Outokumpu Stainless USA, LLC*

## Certificate of Service

I certify that on April 10, 2023, a copy of the foregoing has been electronically filed with the Clerk of the Court using the CM/ECF system, which will serve it on the following CM/ECF participants. If a party served does not participate in the CM/ECF system, I have served them by U.S. First Class.

Ian D. Rosenthal, Esq.
Davis, Davis and Associates
27180 Pollard Road
Daphne, Alabama 36526
ian@ddalawfirm.com

Patrick H. Sims, Esq.
P. O. Box 2906
Mobile, Alabama 36652
patrick@simslawfirm.net

Frederick G. Helmsing, Jr., Esq.
McDowell Knight Roedder &
  Sledge, LLC
11 North Water Street
Suite 13290
Mobile, Alabama 36602
fhelmsing@mcdowellknight.com

*s/ Devin C. Dolive*
OF COUNSEL