No. 22-13691-HH

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

WILLIAM HORNADY, ET AL.,

*Appellees–Cross-Appellants,*

vs.

OUTOKUMPU STAINLESS USA, LLC,

*Appellant–Cross-Appellee.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF ALABAMA
NO. 1:18-CV-00317-JB-N

## REPLY BRIEF OF APPELLANT/RESPONSE BRIEF OF CROSS-APPELLEE

Cheri Turnage Gatlin
BURR & FORMAN LLP
190 East Capitol Street
Suite M-100
Jackson, Mississippi 39201
(601) 709-3444

Devin C. Dolive
BURR & FORMAN LLP
420 North 20th Street
Suite 3400
Birmingham, Alabama 35203
(205) 251-3000

*Attorneys for Appellant Outokumpu Stainless USA, LLC*

No. 22-13691-HH

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

WILLIAM HORNADY, ET AL.,

*Appellees–Cross-Appellants,*

vs.

OUTOKUMPU STAINLESS USA, LLC,

*Appellant–Cross-Appellee.*

## APPELLANT OUTOKUMPU STAINLESS USA, LLC'S CERTIFICATE OF INTERESTED PERSONS

Under Eleven Circuit Rule 26.1-2(b), counsel of record for Appellant Outokumpu Stainless USA, LLC certify that the Certificate of Interested Persons contained in its (opening) Appellant's Brief was correct.

s/ Devin C. Dolive
Devin C. Dolive

One of the Attorneys for
Appellant Outokumpu Stainless
USA, LLC

**OF COUNSEL**
Devin C. Dolive
BURR & FORMAN LLP
420 North 20th Street
Suite 3400
Birmingham, Alabama 35203
(205) 251-3000
ddolive@burr.com

Cheri Turnage Gatlin
BURR & FORMAN LLP
190 East Capitol Street
Suite M-100
Jackson, Mississippi 39201
(601) 709-3444
cgatlin@burr.com

## Statement Regarding Oral Argument for Cross-Appeal

Oral argument is warranted on cross-appeal filed by Hornady, et al.[1] for reasons similar to why it is also warranted in OTK's underlying appeal. Their cross-appeal effectively argues that the trial court did not go far enough in sanctioning OTK. Correcting for mathematical errors in their Appellees' Brief, Hornady, et al. value their cross-appeal at approximately $3.5 million (versus the approximately $13.1 million at issue in OTK's underlying appeal). This total of approximately $16.6 million (i.e., $13.1 million plus $3.5 million) would be recoverable only because of the trial court's sanctions. Accordingly, oral argument is warranted because the cross-appeal, like the underlying appeal, involves unprecedented sanctions entered against a litigant—not its counsel— both for "discovery violations" and for then-counsel's "actual misrepresentations" to the trial court.

---

[1] This Reply Brief will use the same identification of the parties as in Appellant's opening Brief. Thus, the Appellant-Cross-Appellee is "OTK" and the 276 Appellees-Cross-Appellants are "Hornady, et al."

# **Table of Contents**

Certificate of Interested Persons ............................................................ C-1

Statement Regarding Oral Argument for Cross-Appeal .......................... i

Table of Contents .................................................................................... ii

Table of Citations .................................................................................... v

I.    Statement of Issues for Cross-Appeal ............................................. 1

II.   Statement of the Case for Cross-Appeal .......................................... 1

      A.   Nature of the Case on Cross-Appeal ........................................ 1

      B.   Statement of Facts and Procedural History on Cross-Appeal ................................................................................... 2

      C.   Standards of Review for Cross-Appeal .................................... 6

III.  Summary of the Argument .............................................................. 7

IV.   Argument ........................................................................................ 10

      A.   Contrary to Hornady, et al.'s argument, OTK is appealing the district court's findings of bad faith and willfulness. .............................................................................. 10

      B.   The recent jury verdict in the companion *Gibson* case confirms that the district court's award of $13.1 million in damages (which would increase to $16.6 million if Hornady, et al. prevail on their cross-appeal) is a windfall. ................................................................................ 13

      C.   Hornady, et al. concede that "[n]otice and opportunity to respond are the essential requirements of due process," and thus, OTK's appeal raises due-process issues. ................ 15

D.  The ultimate default sanction was entered based on OTK's failure to provide "pay rate" information that (a) OTK could not provide without ADP's assistance and that (b) Hornady, et al. did not use even after ADP provided it. ..........................................................................20

E.  The draconian sanction of default cannot be upheld simply through showing one or more instances of arguably sanctionable conduct where lesser sanctions would have sufficed to remedy any actual misconduct found. ...................................................................................29

F.  Try as they might, Hornady, et al. cannot hide from the fact that the district court never once conducted a "good cause" analysis under Rule 55(c) in evaluating OTK's motion asking the court to reconsider the default sanction. .................................................................34

G.  The "well-pleaded allegations" of the Third Amended Complaint fail to state actionable FLSA overtime claims on either OTK's workweek or its percentage bonus............38

   1.  OTK's workweek .........................................38

   2.  OTK's percentage bonus ..............................44

H.  Hornady, et al. cannot substantiate their $13.1 million (or $16.6 million, including the cross-appeal) in damages through any affidavit, much less through live testimony....51

I.  Regarding Hornady, et al.'s cross-appeal, entering a default as to liability does not mean that a district court should ignore the applicable statutes of limitations on a plaintiff's claims. ..................................................54

J.  Hornady, et al. were not denied due process when the district considered, and rejected, the "equitable tolling" arguments that Hornady, et al. raised eight months after the district court's opt-in deadline. ..............................58

iii

V.    Conclusion ...................................................................... 60

Certificate of Compliance ....................................................... 62

Certificate of Service ............................................................. 63

# **Table of Citations**

Cases:                                                                        Page(s)

*Abarca v. Merck & Co.,*
    No. 1:07cv0388, 2011 WL 3667290
    (E.D. Cal. Aug. 22, 2011)............................................................ 24

***Adolph Coors Co. v. Movement Against Racism & the Klan,*
    777 F.2d 1538 (11th Cir. 1985) ..................................30, 51, 52, 53

*Akers v. Tim Jungblut Trucking, Inc.,*
    No. 1:18-cv-03316, 2020 WL 1447647
    (S.D. Ind. Mar. 20, 2020)............................................................ 48

*Amlong & Amlong, P.A. v. Denny's, Inc.,*
    500 F.3d 1230 (11th Cir. 2007) ........................................... 29, 30

*Annette v. Haslam,*
    No. 3:18-cv-1299, 2020 WL 2520512
    (M.D. Tenn. May 18, 2020) ....................................................... 56

*Barragan v. Home Depot U.S.A., Inc.,*
    No. 3:19-cv-01766, 2021 WL 3634851
    (S.D. Cal. Aug. 17, 2021) ........................................................... 50

*Bonner v. City of Prichard,*
    661 F.2d 1206(11th Cir. 1981) .................................................. 31

*Breig v. Covanta Holding Corp.,*
    No. 21-865, 2022 WL 837242 (E.D. Pa. Mar. 21, 2022)............. 48

***Chudasama v. Mazda Motor Corp.,*
    123 F.3d 1353 (11th Cir. 1997) .....................................30, 31, 32

*Clark v. Ga. Pardons & Paroles Bd.,*
    915 F.2d 636, 640 (11th Cir. 1990) ........................................... 55

<u>Cases:</u>                                                              <u>Page(s)</u>

*Cleveland Bd. of Educ. v. Loudermill,*
    470 U.S. 532 (1986) ............................................................. 15, 18

\*Cmty. Dental Servs. v. Tani,*
    282 F.3d 1164 (9th Cir. 2002) .............................................. 19, 20

*Day v. Nat'l Life Ins. Co.,*
    122 F.3d 1012 (11th Cir. 1997) ............................................ 57, 58

*Eades v. Ala. Dep't of Human Res.,*
    298 F. App'x 862 (11th Cir. 2008) (per curiam) .................. 31, 32

\*Emerick v. Fenick Indus., Inc.,*
    539 F.2d 1379, 1381 (5th Cir. 1976) .................................... 31, 32

*Flowers v. City of Detroit,*
    306 F. App'x 984 (6th Cir. 2009) ................................................ 12

*Galt v. Eagleville Hosp.,*
    310 F. Supp. 3d 483 (E.D. Pa. 2018) ......................................... 26

*Gibson v. Outokumpu Stainless USA, LLC,*
    No. 21-00103-JB-N, 2023 WL 2604812,
    (S.D. Ala. Mar. 22, 2023) ............................................ 7, 13, 14, 34

*Grayson v. K Mart Corp.,*
    79 F.3d 1086 (11th Cir. 1996) .................................................... 57

*Harris v. Best Buy Stores, L.P.,*
    No. 15-cv-00675, 2016 WL 6248893
    (N.D. Cal. Oct. 26, 2016) ........................................................... 45

*Harris v. Best Buy Stores, L.P.,*
    No. 15-cv-00675, 2016 WL 4073327
    (N.D. Cal. Aug. 1, 2016) ........................................................... 45

Cases:                                                                                    Page(s)

*Jefferson v. State Bar of Ga.,*
    No. 22-12835, 2023 WL 569458
    (11th Cir. Jan. 27, 2023) (per curiam) ...................................... 14

*Jerkins v. Lincoln Elec. Co.,*
    103 So. 3d 1 (Ala. 2011) .............................................................. 55

*Lemm v. Ecolab Inc.,*
    303 Cal. Rptr. 3d 364 (Cal. Ct. App. 2023) ............................... 50

*Leonhard v. United States,*
    633 F.2d 599 (2d Cir. 1980) ........................................................ 56

*Levald v. City of Palm Desert,*
    998 F.2d 680 (9th Cir. 1993) ...................................................... 56

*Link v. Wabash R.R. Co.,*
    370 U.S. 626 (1962) ............................................................. 19, 20

*Malautea v. Suzuki Motor Co.,*
    987 F.2d 1536 (11th Cir. 1993) ................................................... 33

*\*Mischler v. Bevin,*
    No. 18-5665, 2019 WL 2644639 (6th Cir. May 8, 2019) ........... 56

*Nat'l Hockey League v. Metro. Hockey Club, Inc.,*
    427 U.S. 639 (1976) (per curiam) .............................................. 31

*Nishimatsu Constr. Co. v. Houston Nat'l Bank,*
    515 F.2d 1200 (5th Cir. 1975) .................................................... 55

*Roche Diagnostics Corp. v. Priority Healthcare Corp.,*
    No. 2:18-cv-01479-KOB-HNJ, 2021 WL 289597
    (N.D. Ala. Jan. 28, 2021) ........................................8, 9, 34, 35, 36

**Cases:**                                                                                                    **Page(s)**

*\*Russell v. Gov't Emps. Ins. Co.,*
    787 F. App'x 953 (9th Cir. 2019) .....................................46, 47, 48

*Sapuppo v. Allstate Floridian Ins. Co.,*
    739 F.3d 678 (11th Cir. 2014) .............................................. 29, 30

*\*Searock v. Stripling,*
    736 F.2d 650 (11th Cir. 1984) .............................................. 20, 28

*Serra Chevrolet, Inc. v. Gen. Motors Corp.,*
    446 F.3d 1137 (11th Cir. 2006) ................................................. 6, 7

*Shepard v. City of Waterloo,*
    No. 14-CV-2057, 2015 WL 9165915
    (N.D. Iowa Dec. 16, 2015)........................................................... 50

*Sutton v. Diversity at Work Grp. Inc.,*
    No. 1:20-CV-00682, 2021 WL 2334488
    (S.D. Ohio June 8, 2021) ........................................................... 25

*Tamiami Condo. Warehouse Plaza Ass'n v. Markel Am. Ins. Co.,*
    No. 1:19-cv-21289, 2019 WL 7821249
    (S.D. Fla. Dec. 13, 2019), *R. & R. adopted*,
    2020 WL 510112 (S.D. Fla. Jan. 31, 2020) ............................... 24

*Thomas v. Clayton Cnty. Bd. of Comm'rs,*
    No. 22-10762, 2023 WL 1487766
    (11th Cir. Feb. 3, 2023) (per curiam) ................................... 29, 30

*Troxel v. Gunite Pros, LLC,*
    No. 21-0057, 2022 WL 37525 (S.D. Ala. Jan. 4, 2022) .............. 26

*United States v. Lee,*
    203 F.3d 1306 (11th Cir. 2000) (per curiam) ............................... 6

Cases:                                                                Page(s)

*Weninger v. General Mills Operations, LLC,*
    344 F. Supp. 3d 1005, 1008 (E.D. Wisc. 2018) ........................... 50

*White v. Publix Super Markets, Inc.,*
    No. 3:14-cv-1189, 2015 WL 4949837,
    (M.D. Tenn. Aug. 19, 2015) ................................................. 45, 48

*Zarnow v. City of Wichita Falls,*
    614 F.3d 161 (5th Cir. 2010) ...................................................... 36


Statutes:

28 U.S.C. § 1927 ................................................................... 30

*29 U.S.C. § 255 ........................................................... 56, 58

*29 U.S.C. § 256 ........................................................... 57, 58

42 U.S.C. § 2000e-5 ............................................................. 29


Rules & Regulations:

*29 C.F.R. § 778.210 .................................................... 42, 48

Fed. R. Civ. P. 55 ................................................... 9, 35, 36

Other:                                                        Page(s)

Pl.'s Mot. for New Trial Pursuant to Fed. R. Civ. P. 59,
    *Gibson v. Outokumpu Stainless USA, LLC*,
    No. 21-00103-JB-N (S.D. Ala. June 19, 2023),
    ECF No. 166 ............................................................. 34

Def.'s Resp. to Pl.'s Mot. for New Trial Pursuant to
    Fed. R. Civ. P. 59, *Gibson v. Outokumpu Stainless
    USA, LLC*, No. 21-00103-JB-N (S.D. Ala. July 13, 2023),
    ECF No. 177 ............................................................. 54

Def's Resp. to Pl.'s Mot. for New Trial Pursuant to
    Fed. R. Civ. P. 59, Ex. B (Verdict Form),
    *Gibson v. Outokumpu Stainless USA, LLC*,
    No. 21-00103-JB-N (S.D. Ala. July 13, 2023),
    ECF No. 177-2 ...................................14, 34, 38, 42, 44

U.S. Dep't of Labor, Wage & Hour Div., Opinion Letter
    FLSA2019-7, 2019 WL 2914103 (July 1, 2019) ......................... 50

U.S. Dep't of Labor, Wage & Hour Div., Opinion Letter
    FLSA2018-9, 2018 WL 5393308 (Jan. 5, 2018) ........................ 48

U.S. Dep't of Labor, Wage & Hour Div., Opinion Letter
    FLSA2006-4NA, 2006 WL 4512946 (Feb. 17, 2016)................. 48

U.S. Dep't of Labor, Wage & Hour Div., Opinion Letter
    FLSA2005-22, 2005 WL 3308593 (Aug. 26, 2005)............... 45, 48

U.S. Dep't of Labor, Wage & Hour Div., Opinion Letter
    FLSA2005-17, 2005 WL 2086806 (May 27, 2005) .................... 43

U.S. Dep't of Labor, Wage & Hour Div., Opinion Letter,
    1998 WL 852723 (Feb. 23, 1998)................................................ 50

U.S. Dep't of Labor, Wage & Hour Div., Opinion Letter,
    1997 WL 998000 (Jan. 23, 1997)......................................... 48, 49

## I.    Statement of Issues for Cross-Appeal

1.    After entry of a default, can a Complaint satisfy the "well-pleaded complaint" rule when it seeks to recover on claims barred by the limitations periods contained in 29 U.S.C. §§ 255(a) and 256(b)?

2.    Is a litigant deprived of due process merely because the district court orders the litigant not to file further briefing on an issue where the litigant nonetheless files further briefing, and the arguments in the briefing are fully considered and rejected by the district court?

## II.    Statement of the Case for Cross-Appeal[2]

### A.    Nature of the Case on Cross-Appeal

At issue in Hornady, et al.'s cross-appeal are the FLSA claims of 219 out of the 276 Plaintiffs who are the putative beneficiaries of the district court's $13,171,958.56 Default Judgment. (Doc. 410.)

Having gotten the district court to sanction OTK and enter the Default Judgment, Hornady, et al. are not just asking this Court to affirm

---

[2] In citing the briefing in this Court, OTK will cite its opening Brief as "Appellant's Br.," followed by the page number showing on the bottom of the page. Likewise, OTK will cite Hornady, et al.'s opening Brief as "Appellees' Br.," followed by the page number showing on the bottom of the page.

this Default Judgment of more than $13.1 million. They also cross-appeal in an attempt to obtain an additional $3,507,908.66 in damages,[3] so as to bring their total recovery in excess of $16.6 million. (*See* Doc. 407-10, PageID 6798.) Thus, in Hornady, et al.'s view, the district court did not go far enough in sanctioning OTK.

### B. Statement of Facts and Procedural History on Cross-Appeal

Hornady, et al. first raised an "equitable tolling" argument for future opt-in Plaintiffs via a motion (Doc. 22) they filed in August 2018, a month after Hornady, et al. had filed their First Amended Complaint (Doc. 5) adding collective-action allegations into the case. OTK opposed Hornady, et al.'s motion via a response filed in October 2018, and Hornady, et al. filed a reply in November 2018. (Docs. 62 & 66.)

---

[3] Hornady, et al.'s Brief artificially inflates this $3,507,908.66 figure by $197,999.86 by switching the "5" and "7" digits before the decimal, thereby rendering this amount as $3,705,908.52. (Appellees' Br. 26, 33, 78.) However, by referring to figures shown in "Exhibit 8" (Doc. 407-10) to the parties' August 2022 "Joint Submission on Damages," it is clear that correct figure is $3,507,908.52. Specifically, using the amounts shown on this "Exhibit 8," $16,679,460.22 minus $13,171,958.56 equals **$3,507,501.66**, and **not** the $3,705,908.52 figure listed by Hornady, et al. in their Appellees' Brief.

Thereafter, when the district court entered its subsequent "Order for Conditional Class Certification" (Doc. 93) in May 2019, the district court stated that it would be premature, at that time, to rule on Hornady, et al.'s "equitable tolling" argument. Instead, the district court explained that those issues would be better addressed "after the expiration of the deadline for individuals opt-in to this litigation as Plaintiffs." (Doc. 93, PageID 571-572.) The opt-in period was to close in September 2019. (*Id.*, PageID 579.)

Even after the opt-in deadline passed, however, Hornady, et al. would continue to file consents for additional opt-ins until January 2020. (Docs. 145, 151, & 173.) These "late" opt-ins included Matthew Jackson and Jamlus Watson, two Plaintiffs who are among the 22 Plaintiffs that Hornady, et al.'s counsel has determined have no claim for FLSA damages within three years of the filing of their opt-in notices. (Doc. 151; Doc. 410-2, PageID 6879 & 6885 (showing "$0.00" in "Total FLSA Damages (SOL)" for both Matthew Jackson and Jamlus Watson); *see also* Appellees' Br. 33 (noting that 22 Plaintiffs "receive[] nothing under the FLSA").)

3

In May 2020, approximately four months after the last Plaintiff had filed his consent to opt-in (Doc. 173), Hornady, et al. filed a "Renewed Motion to Equitably Toll Statute of Limitations." (Doc. 204.) Just like it had done with Hornady, et al.'s previous August 2018 motion (Docs. 22 & 62), OTK also opposed Hornady, et al.'s "renewed" request for equitable tolling. (Doc. 213.)

The district court held, in June 2020, that Hornady, et al.'s renewed request here would remain "stayed" for the time being. (Doc. 221, PageID 2633.) Then, eight months later, on February 3, 2021—just over a month before the March 12, 2021 show-cause hearing (Doc. 303) triggering sanctions against OTK—the district court entered a detailed Order ruling on the "Renewed Motion to Equitably Toll Statute of Limitations" (Doc. 204) and denied Hornady, et al.'s request for equitable tolling. (Doc. 276.)

Hornady, et al. ignored the district court's February 3, 2021 Order. Instead, when they submitted their proposed damage calculations following the entry of default, they included FLSA damages running back more than three years before each Plaintiff had filed his or her opt-in notice. (Docs. 356, 357, & 358.) In response, OTK stated, as its "Objection

No. 4" that "Plaintiffs' damages calculations are inconsistent with the Court's prior ruling (Doc. 276) on Plaintiffs' arguments for "equitable tolling" of the statute of limitations …." (Doc. 363, PageID 5640-5644.) The district court, following a hearing held on March 4, 2022 (Doc. 442), sustained this "Objection No. 4." (Doc. 366, PageID 5662.)

Nevertheless, when Hornady, et al. submitted their "final" FLSA damage calculations in August 2022, they renewed their twice-rejected request (Docs. 276 & 366) for FLSA damages going back more than three years before each Plaintiff had filed his or her opt-in notice. (Doc. 406, PageID 6649.) They specifically asked to be awarded FLSA damages as "if the FLSA statute of limitations is not applied." (*Id.*)

They calculated that 219 of the 276 Plaintiffs would be entitled to additional FLSA damages if the overtime calculations could reach back more than three years before each Plaintiff had filed his or her opt-in notice. (Doc. 407-10, PageID 6796-6798.)[4] Included in this count of 219

---

[4] Hornady, et al. stated, as part of the August 2022 submission on damages, as follows: "Plaintiffs impacted by the denial of equitable tolling are highlighted in yellow, and are listed alphabetically in Ex. 8 before other Plaintiffs." (Doc. 406, PageID 6649.) The attached "Ex. 8" lists 57 Plaintiffs not "highlighted in yellow" (Doc. 407-10, PageID 6796-6798), and 276 minus 57 equals 219.

are the 22 Plaintiffs Hornady, et al.'s calculations show as receiving "$0.00" in FLSA damages if the "SOL" (i.e., statute of limitations) applies. (Doc. 410-2, PageID 6861-6886; *see* Appellees' Br. 33.)

It is the claims of these 219 Plaintiffs seeking additional FLSA damages that give rise to the Notice of Cross-Appeal (Doc. 426) that Hornady, et al. filed on November 7, 2022.

### C.    <u>Standards of Review for Cross-Appeal</u>

Hornady, et al. fail to identify what standard of review should apply to their cross-appeal.

The first issue in their cross-appeal challenges the district court's application of the statutory language in 29 U.S.C. §§ 255(a) and 256(b). Matters of law are reviewed *de novo. United States v. Lee*, 203 F.3d 1306, 1307 (11th Cir. 2000) (per curiam).

The second issue in Hornady, et al.'s cross-appeal is whether the district court's denial of additional sanctions violated their due-process rights. Here, the Eleventh Circuit has said (in a case that clearly applies to OTK's underlying appeal): "We review *de novo* the argument that the sanctions imposed by the district court violated due process." *Serra*

*Chevrolet, Inc. v. Gen. Motors Corp.*, 446 F.3d 1137, 1147 (11th Cir. 2006).[5]

### III.    Summary of the Argument

The Appellees' Brief filed by Hornady, et al. recites the district court's findings but glosses over how the district court reached those findings. As OTK has shown, the district court's findings of willfulness and bad faith do not withstand scrutiny in light of the record below.

As an initial matter, events subsequent to the filing of the Appellant's Brief make clear that the $13.1 million judgment—which Hornady, et al. now seek to transform to a judgment for more than $16.6 million via their cross-appeal—is a windfall. OTK, in its Appellant's Brief, already referenced the summary judgment rulings entered against OTK in the companion case of *Gibson v. Outokumpu Stainless USA, LLC*, No. 21-00103-JB-N, 2023 WL 2604812 (S.D. Ala. Mar. 22, 2023). However, at the subsequent trial in *Gibson*, the jury found no damages attributable to any FLSA violations.

---

[5] This *Serra Chevrolet* decision contradicts Hornady, et al.'s argument that "an abuse of discretion standard" should apply to the due-process concerns implicated by OTK's appeal. (*See* Appellees' Br. 30.)

Hornady, et al. concede that "notice and opportunity to respond" are key elements of due process. Here, OTK never had the opportunity to respond to the issues raised at the district court's March 12, 2021 hearing leading to the default sanctions. The district court's October 4, 2022 Order (Doc. 409) held that OTK should have introduced evidence that its then-counsel at Littler were keeping OTK in the dark about at the very time when Littler was keeping OTK in the dark. One matter OTK was kept in the dark about was then-counsel's conflict of interest with ADP, but the discovery sanctions were entered based on OTK's failure to produce information that OTK could not produce without ADP's assistance.

Hornady, et al. misstate this Court's standard of review when they suggest that OTK must successfully challenge every single one of the district court's findings of misconduct in order to obtain reversal of the district court's case-ending default sanctions. Under this Court's precedent, reversal is warranted where, as here, lesser sanctions would have (and already have) sufficed to remedy any misconduct in this record.

Hornady, et al. do not dispute that the district court's cited authority of *Roche Diagnostics Corp. v. Priority Healthcare Corp.*, No.

2:18-cv-01479-KOB-HNJ, 2021 WL 289597 (N.D. Ala. Jan. 28, 2021), does not hold what the district court said it held regarding the legal standards governing motions for reconsideration. By refusing to consider the evidence OTK submitted, through new, non-conflicted counsel, the district court did not conduct the "good cause" / "just reason" analysis contemplated by Rule 55(c) and by *Roche* itself. That, too, merits reversal.

Hornady, et al. misconstrue the governing law under the FLSA regarding both OTK's workweek and its percentage bonus. Hornady, et al's Brief cites a total of 19 authorities on the subject of percentage bonuses, but not one of those authorities finds a bonus plan like OTK's to be in violation of the FLSA.

Finally, in defending the underlying Default Judgment, Hornady, et al. argue that the $13.1 million damages figure—which the cross-appeal seeks to increase to $16.6 million—is the result of "mathematical calculations" and did not require affidavits or live testimony to establish. That is an over-simplification that ignores Hornady, et al.'s own record acknowledgements of "ghosts in the machine."

This then leaves Hornady, et al.'s cross-appeal. In seeking to increase their total judgment amount from more than $13.1 million up to

more than $16.6 million, Hornady, et al. gloss over the fact that a complaint cannot be "well-pleaded" when it goes against the applicable statute of limitations. Hornady, et al. have given this Court no reason to read 29 U.S.C. §§ 255(a) and 256(b) out of the FLSA and have shown no violation of due process as to themselves in this record.

For all these reasons and as shown below, the Court should reverse the district court's $13.1 million Default Judgment against OTK, deny Hornady, et al.'s cross-appeal seeking an additional $3.5 million in damages, and remand this matter for further proceedings in the district court.

## IV.   <u>Argument</u>

### A.   <u>Contrary to Hornady, et al.'s argument, OTK is appealing the district court's findings of bad faith and willfulness.</u>

Hornady, et al. now argue: "Once there are bad faith findings, the courts' inherent power to sanction parties (and lawyers) includes the discretion to enter default judgments. OTK does not dispute that its conduct was sanctionable." (Appellees' Br. 35 (citations omitted).) Hornady, et al. overreach. OTK concedes that there were delays and omissions in its document productions at the time when OTK was

10

represented by conflicted counsel at Littler. (*See, e.g.,* Appellant's Br. 5 ("Excusing past counsel's failings is not what this appeal is about. This appeal is about the appropriate consequences of those past failings ….").) But, OTK is **not** conceding that "past counsel's failings" evidence willfulness or bad faith conduct by OTK. To the contrary, OTK began its opening argument in its Appellant's Brief by pointing out that "a default sanction requires more than just misconduct; it requires willfulness or bad faith." (*Id.* at 32.) Much of what followed in OTK's opening Brief showed how the record evidence here does **not** support the district court's findings of willfulness and bad faith.

In response, Hornady, et al. devote approximately 10 out of the 46 pages of the "Argument" section in their Brief to repeating the district court's findings. (*See* Appellees' Br. 42–52.) But, the relevant question in this appeal is not what the district court found, but whether or not the district court committed reversible error in making those findings.

For example, Hornady, et al. now point to the fact the district court, in denying OTK's request for reconsideration of the default sanctions, denigrated OTK's witness Melissa Pledger and maintained that she merely provided "a false, after-the-fact assertion" in support of OTK's

request for reconsideration of the default sanctions. (Doc. 409, PageID 6836; *see* Appellees' Br. 50.) Such denigration of witnesses (and the accompanying refusal to consider witnesses' evidence) ignores the law: "An imperfect witness is not the same thing as a 'false' witness." *Flowers v. City of Detroit*, 306 F. App'x 984, 988 (6th Cir. 2009). Nothing in the record suggests that the district court ever considered whether Ms. Pledger might be merely "imperfect" and not "false" before finding that she had "doctored" records and sanctioning OTK based on this finding. (*See* Doc. 344, PageID 4648.)

For perspective, applying the same standard as the district court did, Hornady, et al. have themselves filed a "false" Appellees' Brief, insofar as they seek an additional $197,999.86 in damages on their cross-appeal than the amount they sought in the record below. To wit, in their Appellees' Brief, they have switched the "5" and "7" digits before the decimal when listing the amount at issue in their cross appeal. (Appellees' Br. 26, 33, 78.)[6] There is no way adding the approximate $3.7 million figure listed on page 78 of Appellees' Brief to the approximate

---

[6] *See* note 2, *supra*.

$13.1 million listed throughout Appellant's Brief can generate anything close to the $16,679,460.22 total shown in the record below. (*See* Doc. 407-10, PageID 6798.) The math is off by $197,999.86, which, using the district court's reasoning, could be evidence that Hornady, et al. have "doctored" the numbers. Unlike Hornady, et al., though, OTK will not assume that every mistake or misstatement in the record is evidence of willfulness or bad faith and will not argue that every mistake or misstatement merits sanctions. That is not the law.

**B.    The recent jury verdict in the companion *Gibson* case confirms that the district court's award of $13.1 million in damages (which would increase to $16.6 million if Hornady, et al. prevail on their cross-appeal) is a windfall.**

In its opening Brief, OTK noted that the district court, in a recent decision in a companion case brought by the same counsel who represents Hornady, et al., had entered summary judgment on liability in favor of the plaintiff on several FLSA issues. *See Gibson v. Outokumpu Stainless USA, LLC*, No. 21-00103-JB-N, 2023 WL 2604812 (S.D. Ala. Mar. 22, 2023). And, in that companion case, Mr. Gibson's summary judgment ruling as to FLSA liability was premised on the same type of time-clock "rounding" and "percentage bonus" facts that Hornady, et al. have alleged

13

here. *See id.*, 2023 WL 2604812, at *9 & *15. However, since OTK filed its opening Brief, the district court in *Gibson* sent the remaining issues in the case (including damages attributable to its summary judgment rulings on liability) to a jury. The jury returned a verdict finding no damages whatsoever on the FLSA claims. *See* Def.'s Resp. to Pl.'s Mot. for New Trial Pursuant to Fed. R. Civ. P. 59, Ex. B (Verdict Form), *Gibson v. Outokumpu Stainless USA, LLC*, No. 21-00103-JB-N (S.D. Ala. July 13, 2023), ECF No. 177-2, PageID 5905-5906 (hereinafter the "Verdict Form").[7]

OTK does not presume that another jury in the present action would necessarily return the same verdict if this Court were to reverse the Default Judgment and allow Hornady, et al.'s claims to be tried on their merits. But, the fact that at least one jury has found in OTK's favor on the same facts alleged by Hornady, et al. underscores the due-process

---

[7] This Court may take judicial notice of the fact of Mr. Gibson's lawsuit and the filings in that case (such as the jury's verdict form). However, judicial notice does not permit the Court to take notice of the truth of allegations made either by Mr. Gibson or OTK in the companion lawsuit. *See Jefferson v. State Bar of Ga.*, No. 22-12835, 2023 WL 569458, at *2 (11th Cir. Jan. 27, 2023) (per curiam) ("Here, by referring to cases outside the instant litigation, the district court merely noted the existence of those cases and whether they were successful.").

concerns at play when claims are decided on a default basis rather than on the merits.

**C.**    **Hornady, et al. concede that "[n]otice and opportunity to respond are the essential requirements of due process," and thus, OTK's appeal raises due-process issues.**

As part of their cross-appeal, Hornady, et al. argue that they, not OTK, were the ones denied "due process," and they argue, citing *Cleveland Board of Education v. Loudermill*, 470 U.S. 532, 542 (1986): "Notice and opportunity to respond are the essential requirements of due process." (Appellees' Br. 80.) OTK agrees with this description of the requirements of due process. But, on this record, OTK is the one who has been deprived of due process.

The district court, at its seminal March 12, 2021 hearing, noted that the conflict issues posed by OTK's then-counsel's dual representation of both ADP and OTK. (Doc. 303, PageID 3937.) This conflict was highlighted in ADP's March 2021 briefing as well. (Doc. 300, PageID 3792-3793.) OTK's payroll specialist Melissa Pledger was present at this March 12, 2021 hearing. (Doc. 303, PageID 3893.) However, as OTK later established through the Declaration of David Scheid, OTK's then-counsel

15

had not informed OTK that the Littler firm also represented ADP at any time before this March 12, 2021 hearing. (Doc. 368-8, PageID 5873.)

Hornady, et al. now argue that OTK's then-counsel had informed the district court (specifically, the magistrate judge) about the fact that his firm (Littler) also represented ADP at a previous hearing held in October 2020. (Appellees' Br. 12.) However, unlike the critical March 12, 2021 "show-cause" hearing that Ms. Pledger attended, no OTK client representatives attended this previous October 2020 hearing. (*See* Doc. 333, PageID 4374-4376 (identifying attendees).)

Further, when OTK retained new, non-conflicted counsel in April 2021, that new counsel asked to brief the potential sanctions issues before the district court entered any default against OTK. (Doc. 328.) The district court denied that request—thereby denying OTK the opportunity to be heard (via non-conflicted counsel) before the district court sanctioned OTK. (Doc. 329.)

It was only after the district court's November 18, 2021 Order (Doc. 344) that OTK was finally permitted to submit evidence that Littler's conflict and its representation of ADP had not been disclosed to OTK at

the time when it mattered. (Doc. 368-8, PageID 5873, 5939-5948.) The

district court, however, completely disregarded this evidence, explaining:

> To be sure, the Scheid declaration references heretofore
> unproduced emails, relevant to the time frame leading up to
> and surrounding the Show Cause hearing with ADP. …
> [T]hey [the emails] are not "newly-available" evidence
> demonstrating that the Court should reconsider its November
> 18 Order.
>
> More generally, these declarations, and their attachments,
> are declarations of its employees who now attempt to better
> explain the situation. These employees have worked for
> Defendant throughout the pendency of this action. These
> declarations could have been produced before now, in
> response to any of Plaintiffs' various motions for sanctions or
> the R&R.

(Doc. 409, PageID 6843 (footnote omitted).) The district court made clear

that it would not consider the Littler e-mails because "in order to be

properly before this Court on a motion to reconsider, these emails must

be newly-available evidence." (*Id.*, PageID 6842.)

Hornady, et al. now assert:

> OTK argues that severe sanctions have due process
> implications. (OB, p. 64) It never describes how it was
> supposedly deprived an opportunity to be heard when the
> record (and the October 2022 Order) show all of its
> voluminous submissions that the district court considered ….

(Appellees' Br. 56.) Hornady, et al. gloss over what the district court, by

its own admission, chose not to consider.

17

For example, the district court explained: "It is interesting to now learn that ADP employs a 'proprietary RROP formula' to calculate the overtime of Defendant's employees. It would have been extremely useful years ago to know that such a formula was employed; however, Defendant did not share this knowledge." (Doc. 409, PageID 6841.) To put it bluntly, OTK "did not share this knowledge" because it did not have (and thus could not share) this knowledge before the district court decided to sanction OTK. Instead, OTK was represented by counsel who had an undisclosed conflict where ADP was concerned. Thus, OTK never learned, before the district court decided to sanction OTK, that ADP had a "proprietary RROP formula" that it would not share with OTK.

Moreover, even Hornady, et al. concede that there is a "subset of sanctionable misconduct here that was attributable to OTK's counsel." (Appellees' Br. 41.) In light of this concession, Hornady, et al. cannot explain how OTK was ever given what *Cleveland Board of Education v. Loudermill*, 470 U.S. 532, 542 (1986), requires for due process: notice and opportunity to be heard.

The district court has stated that "the sanctions [are] not just for discovery violations. I mean, it's the actual misrepresentations of

18

counsel." (Doc. 442, PageID 8021.)[8] Those "actual misrepresentations of counsel" concerned ADP, and the counsel making those misrepresentations was acting under a conflict where ADP was concerned. (Doc. 303, PageID 3937.) Hornady, et al. now cite *Link v. Wabash Railroad Co.*, 370 U.S. 626 (1962), and argue: "Parties may be sanctioned for their misconduct. Or their counsel's." (Appellees' Br. 40.) However, the *Link* holding was discussed at length in *Community Dental Services v. Tani*, 282 F.3d 1164 (9th Cir. 2002), a case cited in OTK's opening Appellant's Brief. (*See* Appellant's Br. 39.)

The *Community Dental* court explained:

The Supreme Court's decision in *Link* does not require a contrary result. While it is true that *Link* states that an attorney's actions are chargeable to the client, the Court expressly declined to state whether it would have held that the district court abused its discretion if the issue had arisen in the context of a motion under Rule 60(b). Thus, *Link* does not serve as a barrier to establishing the rule that gross

---

[8] Hornady, et al. now accuse OTK of presenting this quote "as if the district court said that sanctions were **solely** for attorney misconduct." (Appellees' Br. 63-64 n.11.) That argument begs credulity. If the sanctions were "solely for attorney misconduct," the district court would have said that that the sanctions were "not for discovery violations." It did not say this but, instead, inserted the word "just." By saying that the sanctions were "not just for discovery violations," the district court made abundantly clear that discovery violations were a contributing, but not sole, factor in the district court's decision to enter sanctions.

negligence by a party's counsel may constitute "extraordinary circumstances" under Rule 60(b)(6).

*Cmty. Dental*, 283 F.3d at 1170 (citations omitted). Here, OTK, in asking the district court to set aside its default sanctions, explained that the court could grant relief "for the same reasons it could grant relief under Rules 59 or 60(b)" and invoked Rule 60(b)(6)'s grounds. (Doc. 369, PageID 5971.) Thus, the Supreme Court's *Link* decision is distinguishable here for the same reason it was in *Community Dental*. As part of appellate review, this Court should not simply gloss over the fact that the district court refused to consider OTK's evidence that previous counsel had kept OTK in the dark about both the discovery issues and the ADP conflict.

### D. The ultimate default sanction was entered based on OTK's failure to provide "pay rate" information that (a) OTK could not provide without ADP's assistance and that (b) Hornady, et al. did not use even after ADP provided it.

As OTK explained in its opening Brief in this Court, "a party's inability to comply with a discovery order" cannot, standing alone, support a case-ending default sanction. *See Searock v. Stripling*, 736 F.2d 650, 653 (11th Cir. 1984). Hornady, et al. now try to distinguish the *Searock* precedent by arguing that "[Melissa] Pledger [an OTK employee] herself was instructed by attorneys to include pay rates in the 2020 Excel

20

production." (Appellees' Br. 58.) However, Hornady, et al. gloss over the fact that the "pay rates" that Ms. Pledger had originally provided (back in 2018) were the subject of Hornady, et al.'s sanctions briefing in the district court. Hornady, et al. previously told the district court: "The most pervasive problem involves pay rate information …" **and** "In 2018 OTK produced for the first 32 Plaintiffs verified spreadsheets which purported to identify a pay rate for each two-week pay period (**but which did <u>not</u> reflect step up rates**)." (Doc. 279, PageID 3579-3580 (emphasis added).)

Hornady, et al. have not shown that OTK could ever obtain, without ADP's assistance, "pay rate" information in Excel format that included the "step up" rates used in determining the "regular rate of pay." Nor have Hornady, et al. shown that OTK could ever obtain the formula ADP was using in averaging the various rates when different hourly rates were used during a pay period. Instead, Hornady, et al. misconstrue the record below and argue, citing ADP's filings in the district court, that "ADP informed OTK, twice, that OTK could generate the relevant information in Excel." (Appellees' Br. 58.)

The cited filings from ADP do not say what Hornady, et al. say they say. At least in part, ADP said just the opposite: "Ms. Quinn further

advised that the best report that ADP maintains is a Payroll Register report that is generated after each payroll **and kept in PDF format**." (Doc. 300, PageID 3801 (emphasis added).) These .pdf reports are information that Hornady, et al. rejected as "basically useless." (Doc. 242-3, PageID 2834.) ADP's submissions to the district court also contain the following two statements: "[T]he payroll contact for Outokumpu should be able to create the requested report in Excel format, as its payroll software has a tool that allows them to create reports," and "Ms. Quinn [at ADP] once again advised that, alternatively, the payroll contact for Outokumpu can create a report in Excel format." (Doc. 300, PageID 3801.) However, the record does **not** support any finding that those "Excel format" reports that OTK could run on its end would contain base "pay rates," much less the "step up" rates used in determining the "regular rate of pay."

Further, the "pay rate" information that Ms. Pledger could not obtain without ADP's assistance but which Hornady, et al. now accuse Ms. Pledger of "cho[osing] to omit" from OTK's spring 2020 production was the same type of rate information, factoring in "step ups" via weighted average, that Hornady, et al. stripped from the ADP data when

ADP provided the data in Excel form in the spring of 2021.[9] Hornady, et al.'s computer programmer, when deposed in the companion *Gibson* case, testified (1) that he used the same damages methodology in the *Gibson* case that he had used for Hornady, et al. and (2) that Hornady, et al.'s counsel had stripped out ADP's "paid rate" column before providing this computer programmer with any of the underlying ADP data. (Doc. 396-5, PageID 6542-6543 & 6552.)

At a minimum, it is confusing that Hornady, et al. did not use the very data whose previous absence they had pointed out to the district court when seeking sanctions in the first place.[10]  Remarkably, despite the magistrate judge's comment that Hornady, et al. consistently made "broad-ranging    and    shifting    complaints    regarding    Defendant's

---

[9] ADP's deponent—deposed in the *Gibson* case after OTK had retained counsel who did not have a conflict with ADP—testified that ADP provided Excel reports custom prepared for this litigation that contained a "paid rate" field.  (Doc. 396-1, PageID 6490-6492.) She also testified that this "paid rate" field was the same as what was showing on the .pdf copies of the Payroll Registers as the "RROP."  (*Id.*, PageID 6494.)

[10] In moving for sanctions in June 2020, Hornady, et al. argued: "Plaintiffs were (mis)led to believe that the information produced included **all required pay rates** (except night shift differential rates), and they had been (mis)led to believe that Defendant had produced the real time and payroll records that were supposed to support its Verified Summary." (Doc. 216, PageID 2464 (emphasis added).)

23

production," which made "it difficult to pinpoint exactly what it is that the Plaintiffs have wanted the Defendant to produce." (Doc. 261, PageID 3275 n.2), the district court, in sanctioning OTK, apparently never considered whether Hornady, et al. might have been pressing for data that Hornady, et al. did not really want. Instead, it appears that Hornady, et al. pressed for data that they had figured out that OTK could not provide—whether it be "step up" rates for the entire time period (and in Excel format) or the "RROP" formulas.

That type of conduct suggests that Hornady, et al. were merely playing "discovery gotcha." *Cf. Tamiami Condo. Warehouse Plaza Ass'n v. Markel Am. Ins. Co.*, No. 1:19-cv-21289, 2019 WL 7821249, at *2 n.3 (S.D. Fla. Dec. 13, 2019) (citing, as evidence of "a game of discovery gotcha," the plaintiff's habit of "unnecessary filings and wasted opportunities to cure deficiencies"), *R. & R. adopted*, 2020 WL 510112 (S.D. Fla. Jan. 31, 2020); *Abarca v. Merck & Co.*, No. 1:07cv0388, 2011 WL 3667290, at *3 (E.D. Cal. Aug. 22, 2011) (noting that a defendant's at-issue interrogatories to plaintiff were duplicative of interrogatories previously served by a co-defendant and adding, "It is apparent that MID [the second defendant] brought this motion in the spirit of discovery

'gotcha' …."). Here, however, the district court never considered whether Hornady, et al. might have been playing "gotcha" and were seeking to set up sanctions and save Hornady, et al. the trouble of having to prove the merits of their case.

Such a "gotcha" tactic would also explain why Hornady, et al. were never willing to limit their discovery to a "statistically significant" sample of time and payroll records for the collective but instead proceeded as if there were 276 separate lawsuits in place of a collective action covering 276 class members.[11] Limiting discovery to a representative sample of the opt-in class is proper and preferable, and it serves the purposes of the collective-action mechanism. *See Sutton v. Diversity at Work Grp. Inc.*, No. 1:20-CV-00682, 2021 WL 2334488, at *3 (S.D. Ohio June 8, 2021) (finding that numerous courts have recognized the value of "statistically significant samples" in FLSA cases and thereby allowing defendants to take discovery from a sample of 17 plaintiffs). Hornady, et al. now cite

---

[11] Hornady, et al. now argue, without citation: "But what it [OTK] describes (a default with $13.1 million in damages under the FLSA and common law for 276 people) would be affirmed in a decertified collective with 276 joindered plaintiffs just like in a collective action." (Appellees' Br. 61.)

25

*Troxel v. Gunite Pros, LLC*, No. 21-0057, 2022 WL 37525 (S.D. Ala. Jan. 4, 2022), and argue that "individualized calculations of damages" are necessary in collective actions. (Appellees' Br. 65-66.) While *Troxel* opined that "individualized calculations of damages" are "inevitable" in FLSA collectives, *Troxel* did not address what those calculations might look like. Perhaps more typical than *Troxel* is the FLSA settlement approved in *Galt v. Eagleville Hospital*, 310 F. Supp. 3d 483 (E.D. Pa. 2018). There, the settlement of both a Rule 23 class (on state-law minimum-wage claims) and an FLSA collective included a lump sum payment of $500 to each class member, plus "individualized additional damages based on actual weeks worked, hours per week worked, and rate of pay during the relevant time period." *Id.* at 489. And, that is exactly the sort of evidence that OTK have provided to Hornady, et al. here. (*See* Doc. 384; Doc. 406, PageID 6626; Doc. 442, PageID 8020.)

Nevertheless, Hornady, et al. argue: "What was never produced included step-up pay rates (before August 2017), colorized records of what time was both authorized and paid for …, incentive bonus documents, and information about late "trued up" payments." (Appellees' Br. 56.) This reference to "late 'trued up payments'" is "discovery gotcha,"

pure and simple. OTK's payroll specialist Melissa Pledger stated in her first Declaration that her deposition testimony about "true-ups" had been "inaccurate": "It is now my understanding that ADP does not use a true-up process …." (Doc. 378, PageID 6049.) Hornady, et al. do not address this portion of Ms. Pledger's Declaration, but this was an issue that the jury decided in OTK's favor in the companion *Gibson* case. *See Gibson* Verdict Form, *supra*.

Regarding the "colorized records," Hornady, et al. do not dispute that this was also addressed via one of OTK's Declarations. (*See* 368-9, PageID 5957; Doc. 396-6, PageID 6556.) Instead, they simply belittle this evidence as "[s]upposedly" showing what it shows. (*See* Appellees Br. 67-68 n.12.)

Regarding "step-up" rates, those potentially impacted 72 out of the 276 members of the collective (approximately 26% of the total), and the step-up rates, where data was missing, could be estimated. (Doc. 406, PageID 6628-6629, 6652-6655.)

Finally, regarding the "bonus" information,[12] Hornady, et al. do not explain how the "missing" information was relevant to any part of their "individualized" damages calculations.

The fact remains that Hornady, et al. received sufficient data to calculate more than $13.1 in damages (or $16.6 million if they are successful on the cross-appeal). Despite this, Hornady, et al. still seek to play "discovery gotcha." The fact remains that OTK could never obtain, without ADP's assistance, "pay rate" information in Excel format that included the "step up" rates used in determining the "regular rate of pay." Thus, under this Court's precedent, the case-ending discovery sanctions were error. *See Searock*, 736 F.2d at 653.

---

[12] Though not in this record in this case, the e-mails relating to the bonus that were identified in the district court's orders were produced to Hornady, et al.'s counsel as part of the companion *Gibson* case but were never used by the plaintiff in the jury trial of that case.

28

**E.**  **The draconian sanction of default cannot be upheld simply through showing one or more instances of arguably sanctionable conduct where lesser sanctions would have sufficed to remedy any actual misconduct found.**

In seeking affirmance, Hornady, et al. misstate the governing legal standard and argue:

> [T]o reverse a judgment based on multiple, independent grounds an appellant must convince this Court that "every stated ground for the judgment against him is incorrect." *Thomas v. Clayton Cnty. Bd. of Commissioners*, [No. 22-10762,] 2023 WL 1487766, at *3 (11th Cir. Feb. 3, 2023) [(per curiam)]; *Sapuppo v. Allstate Floridian Ins.* [*Co.*], 739 F.3d 678, 680 (11th Cir. 2014). The district court made many explicit findings about various ways OTK violated various orders and conducted itself in bad faith for years. As a starting point, OTK would have to show that every one of those determinations was clear error. It has not attempted that impossible task.

(Appellees' Br. 37–38.) Hornady, et al.'s argument makes little sense in

the context where the district court's ruling now on appeal is a case-

ending default sanction. In fact, neither *Thomas* nor *Sapuppo* involved a

default sanction.[13] And, unlike the dismissals at issue in those cases, the

---

[13] Instead, both cases concerned this Court's review of district court rulings on Rule 12(b) motions to dismiss. *See Thomas*, 2023 WL 1487766, at *3; *Sapuppo*, 739 F.3d at 680. The one default sanction case Hornady, et al. cite as part of the discussion in this section of their Appellees' Brief is *Amlong & Amlong, P.A. v. Denny's, Inc.*, 500 F.3d 1230 (11th Cir. 2007). What *Amlong* held was as follows: "The district court grounded its sanctions decision on four broad sources of authority. 42 U.S.C. § 2000e-

$13.1 million Default Judgment against OTK did not purport to be "based on multiple, independent grounds." *Sapuppo*, 739 F.3d at 680.

The law on default sanctions is settled: if less severe sanctions would be effective, a court sanctioning with a default judgment abuses its discretion in not considering the lesser sanction. *See Chudasama v. Mazda Motor Corp.*, 123 F.3d 1353, 1371 (11th Cir. 1997) (reasoning that a court abuses its discretion if it enters a default when "less draconian but equally effective sanctions were available" (quoting *Adolph Coors Co. v. Movement Against Racism & the Klan*, 777 F.2d 1538, 1543 (11th Cir. 1985)).)

In its opening Brief, OTK explained that a district court has "less discretion" to enter case-ending sanctions than it does for other types of sanctions. Hornady, et al. now contend that OTK made that argument

---

5(k); 28 U.S.C. § 1927; Rule 26(g) of the Federal Rules of Civil Procedure; and the court's inherent powers. When a district court cites multiple sources of authority for issuing sanctions, the appellate court's basic task is to determine .whether sanctions were permissible under at least one of those sources of authority." *Amlong*, 500 F.3d at 1238. The "sources of authority" that *Amlong* refers to are the various sources of the courts' powers (authority) to enter sanctions in the first place and should not be conflated with the "every stated ground" standard from *Thomas* and *Sappupo*.

"without relevant citation" (Appellees' Br. 57), but OTK's opening Brief made clear that OTK was relying on the binding precedents of *Chudasama*, 123 F.3d at 1366, and *Emerick v. Fenick Indus., Inc.,* 539 F.2d 1379, 1381 (5th Cir. 1976).[14] (*See* Appellant's Br. 33–34.) In response, Hornady, et al. now cite *National Hockey League v. Metropolitan Hockey Club*, Inc., 427 U.S. 639 (1976) (per curiam), and *Eades v. Alabama Department of Human Resources*, 298 F. App'x 862 (11th Cir. 2008) (per curiam). (Appellees' Br. 57.) However, contrary to Hornady, et al.'s implication, there is no inconsistency between (1) *Chudasama* and *Emerick* and (2) *National Hockey League* and *Eades*.

Indeed, the former Fifth Circuit in *Emerick* discussed, quoted, and applied the Supreme Court's *National Hockey League* decision (decided earlier in the same year). *See Emerick*, 539 F.2d at 1381. This Court's *Chudasama* decision, in turn, was premised on the rule announced in *Emerick*: "When reviewing an order striking a defendant's pleadings, our 'review should be particularly scrupulous lest the district court too lightly

---

[14] Under *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981), decisions issued by the former Fifth Circuit on or before September 30, 1981 are binding precedents in this Court.

resort to this extreme sanction, amounting to judgment against the defendant without an opportunity to be heard on the merits.'" *Chudasama*, 123 F.3d at 1366 (quoting *Emerick*, 539 F.2d at 1381).[15]

Hornady, et al. have not shown that each alleged discovery violation, standing alone, would merit the case-ending sanction of default. But, OTK has shown, via its opening Brief, that the district court refused to consider evidence, presented through non-conflicted counsel, that OTK's former counsel had kept OTK in the dark about the discovery issues in the litigation and about former counsel's conflict where ADP was concerned. (Doc. 409, PageID 6843.) That refusal alone merits reversal and an accompanying instruction from this Court that the district court must consider what sanctions it would have entered if former counsel's misrepresentations regarding ADP had not happened.

Regarding potential lesser sanctions, Hornady, et al. argue: "Using curious tense choices, OTK says it 'has stated' it 'would be prepared to pay out twice of what (it says) Hornady would have received for rounding.

---

[15] This Court's subsequent, unreported decision in *Eades* examined a district court's dismissal of a case for want of prosecution and therefore did not purport to change the rules announced in *Chudasama* and *Emerick*. *See Eades*, 298 F. App'x at 863.

(OB p. 81) It paid nothing." (Appellees' Br. 60 (footnote omitted).) Admittedly, OTK "paid nothing," except, of course, for the "payments it made to some plaintiffs in the spring of 2022 totaling $334,045.58." (*See* Appellees' Br. 64.) Hornady, et al. also omit to explain why OTK "paid nothing." OTK was prepared to pay out significantly more than the $334,045.58 it already paid, but Hornady, et al. were not interested in receiving such payments. To wit, OTK offered to pay Hornady, et al. approximately $2 million, so as to resolve FLSA "rounding" claims only and without prejudice to Hornady, et al.'s other claims, whether under the FLSA or common law. (Doc. 397, PageID 6574; Doc. 406, PageID 6647; Doc. 407-11; Doc. 439-1, PageID 7935.) Hornady, et al.'s present argument that OTK "paid nothing" makes clear that Hornady, et al. were not interested in that offer.

Contrary to Hornady, et al.'s quote from this Court's decision in *Malautea v. Suzuku Motor Co.*, 987 F.2d 1536, 1546 n.9 (11th Cir. 1993), this is not a case of paying "attorneys to avoid the outcome of the case." (*See* Appellees' Br. 34.) Rather, this is a case of Hornady, et al.'s counsel taking the position of "my way or the highway" at every conceivable juncture.

Further, in light of the jury verdict in OTK's favor in the companion *Gibson* case, even a sanction of approximately $2 million on the "rounding" overtime would be a significant deterrent for others. Notwithstanding a plaintiff's summary judgment ruling on the FLSA "rounding" overtime claim, *see Gibson v. Outokumpu Stainless USA, LLC*, No. 21-00103-JB-N, 2023 WL 2604812, at *15 (S.D. Ala. Mar. 22, 2023), the fact remains that the jury in *Gibson* found zero dollars in FLSA damages. *See* Verdict Form, *supra*.[16]

F. **Try as they might, Hornady, et al. cannot hide from the fact that the district court never once conducted a "good cause" analysis under Rule 55(c) in evaluating OTK's motion asking the court to reconsider the default sanction.**

The district court below identified the standard it was applying when denying OTK's March 2022 "Motion to Reconsider and Clarify the District Court's November 18, 2021 and February 17, 2022 Orders and To Set Aside Default." (Doc. 369.) Specifically, the district court purported to apply *Roche Diagnostics Corp. v. Priority Healthcare Corp.*,

---

[16] The plaintiff in *Gibson* has acknowledged this incongruity by moving for a new trial. *See* Pl.'s Mot. for New Trial Pursuant to Fed. R. Civ. P. 59, *Gibson v. Outokumpu Stainless USA, LLC*, No. 21-00103-JB-N (S.D. Ala. June 19, 2023), ECF No. 166.

No. 2:18-cv-01479-KOB-HNJ, 2021 WL 289597 (N.D. Ala. Jan. 28, 2021), and held that "the Rule 55(c) 'good cause standard' is not applicable to defendants who have appeared and been sanctioned, as opposed to those who have failed to appear or defend." (Doc. 409, PageID 6831.)

Tellingly, in seeking an affirmance of the district court's ruling, Hornady, et al. never once cite *Roche*. Instead, they argue that "OTK waived any argument that its motion to reconsider was subject to anything less than totally discretionary review by the district court." (Appellees' Br. 53.) Although this argument is not developed in the "Argument" section of their Brief,[17] Hornady, et al. provide perhaps more detail in their "Summary of the Argument." There, they argue that "OTK's position was that the district court had total discretion in reconsidering an interlocutory order. Having taken that position, OTK is

---

[17] Instead, Hornady, et al. have mischaracterized OTK's argument as being "that the district court was required to apply a 'good cause' standard under Rule 55(c) that OTK did not lobby for." (Appellees' Br. 53.) It is unclear how and why Hornady, et al. believe that OTK "did not lobby for" a "good cause" standard when OTK's "Motion to Reconsider and Clarify the District Court's November 18, 2021 and February 17, 2022 Orders and To Set Aside Default" included the following express statement: "Under Rule 55(c), 'the court may set aside an entry of default for good cause.' Fed. R. Civ. P. 55(c)." (Doc. 369, PageID 5971.)

estopped from arguing that the district court exceeded what OTK said was infinite discretion." (Appellees' Br. 32.) Hornady, et al. are wrong. OTK never told the district court that it had "infinite discretion" to refuse to set aside the default against OTK. Rather, what OTK explained in the record below was "that a district court's power to revisit an interlocutory decision is plenary—it is 'free to 'reconsider and reverse its decision for any reason it deems sufficient, even in the absence of new evidence or an intervening change in or clarification of the substantive law.'" (Doc. 369, PageID 5971 (citing *Zarnow v. City of Wichita Falls*, 614 F.3d 161, 171 (5th Cir. 2010).) The district court, notably, did not purport to exercise such "plenary" authority. Instead, the district court expressly stated: "This Court agrees with the *Roche* opinion." (Doc. 409, PageID 6831.)

OTK explained in its opening Brief: "[T]he *Roche* case does not say what the district court said it says." (Appellant's Br. 43.) Having not cited *Roche* at all, Hornady, et al. do not dispute that the *Roche* court's "just reason" standard is, effectively, Rule 55(c)'s "good cause" standard. *See* Fed. R. Civ. P. 55(c); *Roche*, 2021 WL 289597, at *5. Thus, Hornady, et al. do not and cannot dispute that the district erred in its purported application of *Roche* to reject Rule 55(c)'s "good cause" standard. The

question remaining is not whether error occurred, but whether this constitutes reversible error. It does.

Hornady, et al. now argue: "The district court rejected all the reasons OTK reh/ashes to this Court as supposed 'good cause.'" (Appellees' Br. 54.) What Hornady, et al. gloss over is **why** the district court "rejected" those reasons. Specifically, the district court found itself bound to Rule 54(b)'s standard and explained:

> [T]he Court will apply the standards applicable to Rule 54(b) to analyze Defendant's Motion to Reconsider the November 18 and February 17 Orders. Under this analysis, in order to convince the Court to alter its decision, Defendant must set forth facts, or newly-available evidence, indicating the need to correct clear error or manifest injustice.

(Doc. 409, PageID 6831.) Thereafter, in evaluating OTK's evidence, the district court focused solely on whether this evidence was "newly-available." (*See id.*, PageID 6842-6843.) That is reversible error.

The district court never once considered whether the issues relating to OTK's former counsel and that counsel's ADP-related conflict might constitute "good cause" for OTK's submission of its employees' declarations only after OTK had obtained new counsel. Contrary to Hornady, et al.'s argument, if the district court had applied a "good cause" standard here, it could easily have reached a different result. Thus, the

37

district court's announced belief that it could only consider "newly-available evidence" requires reversal.

### G. **The "well-pleaded allegations" of the Third Amended Complaint fail to state actionable FLSA overtime claims on either OTK's workweek or its percentage bonus.**

#### 1. **OTK's workweek**

In their Appellees' Brief, Hornady, et al. do not dispute that the effect of the district court's Default Judgment was to "effectively require[] that OTK start every workweek at midnight." (*See* Appellant's Br. 56.)[18] Hornady, et al. now argue that "[i]f an employer starts and stops counting at the wrong date and / or time and operates 24/7/365 then weekly overtime pay miscalculations are inevitable." (Appellees' Br. 67.) Hornady, et al. do not explain to this Court what might make a date and/or time "wrong." Instead, Hornady, et al. say that there was "a mismatch between pay week designations and the time period used to count overtime." (*Id.*)

---

[18] This same "midnight"-start theory was submitted to the jury in the *Gibson* case and rejected. The jury there determined that OTK's workweek started at 6:00 am on Sunday mornings. See Verdict Form, *supra.*

To create a "mismatch," Hornady, et al., in their Third Amended Complaint, refer to "Pay Period Beginning Dates" and "Pay Period Ending Dates" showing up on a screen in an internal OTK computer system for ADP's "Workforce Now" software. (Doc. 223, PageID 2646; *see* Doc. 368-8, PageID 5866-5868; Doc. 378, PageID 6054-6056.) However, as was shown in the evidence submitted in support of OTK's March 2022 "Motion to Reconsider and Clarify the District Court's November 18, 2021 and February 17, 2022 Orders and To Set Aside Default" (Doc. 369)—evidence which the district court refused to consider (Doc. 409, PageID 6843)—that the internal computer screen did not determine how overtime hours were calculated.

Hornady, et al. continue to ignore this evidence and now refer to Ms. Pledger's "March 2020 deposition testimony that in January 2019 she changed the pay period dates in OTK's system in response to the lawsuit." (Appellees' Br. 23.) However, as explained via the Declarations of David Scheid and Melissa Pledger, that computer system (ADP's "Workforce Now") did not determine the starting and ending times for workweek used by a separate computer system (ADP's "Enhanced Time and Attendance") to determine whether any given OTK employee worked

39

more than 40 hours in any given workweek. (Doc. 368-8, PageID 5866-5868; Doc. 378, PageID 6054-6056.) For example, in her March 2022 Declaration, Melissa Pledger explained that OTK's workweek (or "pay week"), in ADP's "Enhanced Time and Attendance" system, "has been 6:00 am on Sunday until 5:59 a.m the following Sunday (or the end of the team members Saturday night shift)." (Doc. 378, PageID 6054-6055.)

In response to this Declaration, Hornady, et al.'s counsel sent an e-mail in May 2022 and said that "paragraph 43" in her March 2022 Declaration was inconsistent with both her previous March 2020 testimony in this action and her May 2022 testimony in the companion *Gibson* case. (Doc. 389-1, PageID 6240.) Hornady, et al. demanded, that in light of this "inconsistency" and other alleged "misstatements" by Ms. Pledger, OTK withdraw its March 2022 "Motion to Reconsider and Clarify the District Court's November 18, 2021 and February 17, 2022 Orders and To Set Aside Default" (Doc. 369) entirely. OTK did not do so.

Therefore, Hornady, et al. filed, in June 2022, a "Miscellaneous Submission About Defendants' Pending Motion to Reconsider, Etc." and made numerous *ad hominem* attacks against OTK's declarants, Mr. Scheid and Ms. Pledger, and their "chutzpah." (Doc. 385, PageID 6216-

6217.) OTK responded by providing a "Supplemental Declaration" (Doc. 389-1) from Ms. Pledger to address the issues Hornady, et al.'s counsel had originally raised in his May 2022 e-mail. Specifically, the issues that Hornady, et al. raised about the workweek were covered in paragraphs 30 through 35 of this "Supplemental Declaration." (*See id.*, PageID 6234-6235.) For example, in paragraph 33, Ms. Pledger added:

> I have tried to guess why Mr. Rosenthal might see paragraph 43 of my March 10, 2022 Declaration as "inconsistent" with my March 11, 2020 deposition testimony in the *Hornady* case. Perhaps I could add to the statement in paragraph 43 of my Declaration that ADP's Enhanced Time calculates overtime hours by looking at whether or not a team member has worked over 40 hours at any time between the team member's clock-in for the Sunday morning shift and the team member's clock-out for the Saturday night shift.

(Doc. 389-1, PageID 6235.) Then, in paragraph 35, she also added: "[T]he most common shift assignment for team members is a rotating six-to-six shift. The workweek for team members assigned six-to-six shifts will encompass 'the 7 consecutive 24 hour period[s] between 6:00 am Sunday and 5:59 am the following Sunday.'" (*Id.*)[19]

---

[19] At the *Gibson* trial, Mr. Gibson's counsel sought to rely on the alleged contradictions in Ms. Pledger's *Hornady* Declarations to impeach her and to argue that the workweek necessarily had to start at midnight. The *Gibson* jury rejected this evidence and held that the workweek

What Hornady, et al. object to is OTK defining its workweeks so as not to split a single shift between two different workweeks. Hornady, et al. would have OTK always split one of its routine 6:00 pm to 5:59 am "night" shifts into different workweeks every week by starting the workweek at midnight. The district court accepted Hornady, et al.'s view uncritically, explaining, in its February 17, 2022 Order: "Plaintiffs allege Defendant routinely tallies hours worked during a workweek in accordance with the Plaintiffs' work schedule, and not based on a fixed, recurring 168-hour period. Plaintiffs' allegations in this regard constitute a *prima facie* violation of 29 C.F.R. § 778.105." (Doc. 351, PageID 4750 (record citations omitted).) This was legal error.

For the majority of members of the collective who worked routine six-to-six shifts, the workweek always began at 6:00 am on Sunday and ended at 5:59 am the following Sunday, as set forth in paragraph 42 of Ms. Pledger's March 2022 Declaration. (Doc. 378, PageID 6054.) This is a recurring 168-hour period, which is what the district court held that the FLSA requires. (Doc. 351, PageID 4750.) But, even in circumstances

_____

started at 6:00 am on Sunday, just as Ms. Pledger said. *See* Verdict Form, *supra.*

42

(such as in the Melt Shop—*see* Doc. 389-1, PageID 6235) where employees work past OTK's typical 6:00 am shift-change-over on Sunday morning, that still does not mean that OTK's "workweek" definition was improper. Rather, the Department of Labor itself has stated that it has "no objection if an employer … pays in advance the compensation that the employee will be due in a subsequent pay period by including all hours worked in a single shift in the workweek in which that shift began," provided that the employer does "not manipulate the schedule in order to avoid the overtime pay requirement of the FLSA." *See* U.S. Dep't of Labor, Wage & Hour Div., Opinion Letter FLSA2005-17, 2005 WL 2086806, at *2 (May 27, 2005).

Hornady, et al. have never pleaded or alleged that OTK "manipulate[d] the schedule" to avoid paying overtime. Instead, Hornady, et al.'s re-definition of the workweek (to start it at midnight) is a ploy to increase the collective's damages above the $2 million the collective would have received based on the time-clock "rounding" practices alone. (Doc. 397, PageID 6574; Doc. 406, PageID 6647; Doc. 407-11; Doc. 439-1, PageID 7935.) In the companion *Gibson* case, the jury, after hearing the evidence, rejected this ploy and found, instead, that

OTK's workweek started at 6:00 am on Sunday mornings. *See* Verdict Form, *supra*.

Hornady, et al. should not be able deny OTK credit for six or more hours of overtime that OTK actually paid in each workweek simply through the "sleight of hand" of re-defining OTK's workweek to start just after midnight and not at 6:00 am. (*See* Doc. 363, PageID 5636-5637.)

## 2.    OTK's percentage bonus

Another way Hornady, et al. have inflated their damage number beyond the $2 million the collective would have received based on the time-clock "rounding" practices alone is by employing the fiction that OTK paid its monthly bonuses as a lump sum and not as a percentage of monthly earnings, including both regular and overtime pay.[20]

In support of their argument on the bonus, Hornady, et al. have now cited 19 authorities (10 court cases and nine Department of Labor opinion letters). (*See* Appellees' Br. 70–71.) But, not one of those 19

---

[20] This, too, is a theory presented in the *Gibson* case for which the jury awarded zero damages. *See* Verdict Form, *supra*.

authorities addresses a challenge like the one Hornady, et al. make to

OTK's bonus plan.[21]

> Hornady, et al. now characterize OTK's bonus practices as follows:
>
> The dollar amount of the bonus is the percentage applied to what the employee paid for the four or six weeks of work that are covered by the two or three paychecks that were issued within the calendar month the bonus was earned. Those 28 or 42-day periods never coincide with the 28, 29, 30, or 31-day calendar month a bonus is earned.

---

[21] Nor, for that matter, are the (mostly inapposite) authorities Hornady, et al. cite consistent with one another. For example, in *White v. Publix Super Markets, Inc.*, No. 3:14-cv-1189, 2015 WL 4949837, at *1 & *18 (M.D. Tenn. Aug. 19, 2015), the court held that an employer is not required, when paying a percentage bonus quarterly, to apply the percentage to the bonus paid for the previous quarter. Stated differently, an employer need not "bonus the bonus." *See* U.S. Dep't of Labor, Wage & Hour Div., Opinion Letter FLSA2005-22, 2005 WL 3308593, at *1 (Aug. 26, 2005) (bonus paid as percentage of calendar-year earnings does not need to include bonus amount paid in February that year based on a percentage of earnings from the previous calendar year). Hornady, et al., however, also cite to *Harris v. Best Buy Stores, L.P.*, No. 15-cv-00675, 2016 WL 4073327 (N.D. Cal. Aug. 1, 2016), where the court held that 29 C.F.R. §778.210 requires that "an employer multiply an employer's total earnings (including bonuses …) by the same percentage." *See id.*, at *5. Hornady, et al. fail to acknowledge that this *Harris* holding is inconsistent with the *White* case that Hornady, et al. also cite, and Hornady, et al. further neglect to the tell the Court that the *Harris* court reconsidered parts of its decision and eventually granted the defendant employer summary judgment on the plaintiff's FLSA claims. *Harris v. Best Buy Stores, L.P.*, No. 15-cv-00675, 2016 WL 6248893, at *2 (N.D. Cal. Oct. 26, 2016).

(Appellees' Br. 73.) In this characterization, Hornady, et al. are too narrowly focused on when "a bonus is earned." OTK's bonuses are **earned** in a calendar month. (Doc. 223, PageID 2653 (alleging that the criteria for OTK's monthly bonus are "calculated based on results over **a calendar month**") (emphasis added).) The bonus is then paid by applying the bonus percentage to the pay (including overtime pay) that each employee **receives during the same calendar month** in which the bonus is earned. Thus, Hornady, et al.'s issue with the bonus is that OTK issues paychecks every two weeks and not monthly.

That same sort of issue is present in the bonus plan described in *Russell v. Government Employees Insurance Co.*, 787 F. App'x 953 (9th Cir. 2019). In *Russell*, the court examined the following bonus plan: "GEICO calculated employee cash payments and trust contributions as a percentage of the employee's 'Total Earnings' in a calendar year, which included regular wages, overtime earnings, and other bonuses." *Id.* at 954. It is not plausible that GEICO issues its full-time hourly employees only one paycheck per calendar year. Therefore, in GEICO's situation, there is a problem like that raised by Hornady, et al. Namely, an employee's "Total Earnings" for a calendar year are going to be reflected

on W-2 forms for tax purposes, but such W-2 earnings will never exactly match with the hours the employee actually worked in a calendar year.

Rather, according to a calendar (which this Court may take judicial notice of), New Year's Day in 2019 fell on a Tuesday. Assuming GEICO's workweek did not start or end on Tuesdays, then January 1, 2019 would have fallen sometime in the middle of GEICO's workweek. Thus, a GEICO's employee's W-2 for the 2018 calendar year (used for GEICO's percentage bonus) would **not** reflect all of the hours a GEICO employee worked in 2018, insofar as an employee working on Monday, December 31, 2018 would **not** get paid for those hours until sometime in 2019. This simple December 31, 2018 example shows that Hornady, et al.'s definition of what constitutes a "mismatch between the period the bonus is earned and the period of earnings the percentage bonus is applied to" is overly broad. (*See* Appellees' Br. 69.)

Remarkably, neither *Russell* nor any of the other 18 authorities that Hornady, et al. cite support Hornady, et al.'s proposed definition of a "mismatch between the period the bonus is earned and the period of

47

earnings the percentage bonus is applied to."[22] In fact, one of these authorities appears to negate any reliance Hornady, et al. may place on an alleged "mismatch" here. *See* U.S. Dep't of Labor, Wage & Hour Div., Opinion Letter, 1997 WL 998000 (Jan. 23, 1997). There, the Department of Labor opined that an employer's percentage-bonus program would comply with 29 C.F.R. § 778.210 where the bonus payment was "computed by multiplying the employees' pay **for an unspecified time**

---

[22] Hornady, et al. cite several authorities that consider (and find compliant with the FLSA) annual percentage-based bonuses of the kind considered by the Ninth Circuit in *Russell. See Breig v. Covanta Holding Corp.*, No. 21-865, 2022 WL 837242, at *2 (E.D. Pa. Mar. 21, 2022) (annual bonus "expressed as a percentage of [the employee's] eligible earnings … defined as total hourly wages earned, including period pay wages …"); U.S. Dep't of Labor, Wage & Hour Div., Opinion Letter FLSA2018-9, 2018 WL 5393308, at *1 (Jan. 5, 2018) ("At the end of the year, as part of its annual bonus program, the employer calculates the non-discretionary bonus to its employees based on a percentage of straight-time and overtime earnings."); U.S. Dep't of Labor, Wage & Hour Div., Opinion Letter FLSA2005-22, 2005 WL 3308593, at *1 (Aug. 26, 2005) ("[Y]our client computes the bonus as a percentage of each employee's straight time and overtime wages earned during the previous calendar year."). Other cases cited by Hornady, et al. similarly approve percentage-based bonuses paid quarterly, monthly (like OTK), or weekly. *See Akers v. Tim Jungblut Trucking, Inc.*, No. 1:18-cv-03316, 2020 WL 1447647, at *2 (S.D. Ind. Mar. 20, 2020) (percentage bonus paid weekly); *White v. Publix Super Markets, Inc.*, No. 3:14-cv-1189, 2015 WL 4949837, at *1 & *18 (M.D. Tenn. Aug. 19, 2015) (percentage bonus paid quarterly); U.S. Dep't of Labor, Wage & Hour Div., Opinion Letter FLSA2006-4NA, 2006 WL 4512946, at *1 (Feb. 17, 2016) (percentage bonus paid monthly).

**period** by a fixed percentage." *Id.*, 1997 WL 998000, at *1 (emphasis added). The Department of Labor approved this percentage-bonus plan even without knowing the time period involved because "the payments would include the same percentage of both the employees' straight time earnings and any overtime compensation paid to the employees for the period in question." *Id.* Accordingly, the only "mismatch" in time periods that might matter is if the "straight time earnings" and "overtime compensation" came from different time periods. In OTK's case, they do not.

There is no "mismatch" in OTK's bonus plan. The bonus that OTK employees earn during the month of February is paid as a percentage of earnings that OTK employees are paid during February—not as a percentage of earnings for, say, the previous December or for any month other than February. Further, OTK's act of paying its employees every two weeks while employee bonuses are "earned" over the course of a calendar month is not a means designed to circumvent the FLSA's overtime requirements.[23] Hornady, et al. have never alleged that they

---

[23] The remaining authorities that Hornady, et al. cite finding FLSA overtime violations based on an employer's bonus plan are distinguishable on their facts. In fact, a number of these authorities

would have received more in bonuses if OTK had issued its ordinary paychecks monthly, rather than every two weeks.

Moreover, courts reject claims seeking "a double counting of 'overtime on overtime'" for percentage bonuses. *See Lemm v. Ecolab Inc.*, 303 Cal. Rptr. 3d 364, 373–74 (Cal. Ct. App. 2023) (applying the California Labor Code's overtime provisions in a manner consistent with

---

involve either true "lump sum" bonuses or percentage-based bonuses that do not consider overtime pay at all. *See Barragan v. Home Depot U.S.A., Inc.*, No. 3:19-cv-01766, 2021 WL 3634851, at *7 (S.D. Cal. Aug. 17, 2021) ("At issue in this case are these minimum $100 bonuses."); *Shepard v. City of Waterloo*, No. 14-CV-2057, 2015 WL 9165915, at *13 (N.D. Iowa Dec. 16, 2015) (bonus "paid a constant rate regardless of the number of hours worked"); U.S. Dep't of Labor, Wage & Hour Div., Opinion Letter FLSA2019-7, 2019 WL 2914103, at *2 (July 1, 2019) ("The annual bonus you describe is not tied to straight-time or overtime hours actually worked, but is instead one percent of the journey straight-time hourly rate for 2,080 hours"). Similarly, an employer does not have a valid percentage-based bonus when it "caps" the number of hours (including overtime hours) to which the bonus can apply. *See* U.S. Dep't of Labor, Wage & Hour Div., Opinion Letter, 1998 WL 852723, at *1 (Feb. 23, 1998) ("[T]he calculation of the bonus is limited to 2,080 hours per year no matter how many hours were actually worked by the employee that year."). Other authorities involve different issues entirely. For example, in *Weninger v. General Mills Operations, LLC*, 344 F. Supp. 3d 1005, 1008 (E.D. Wisc. 2018), the employer applied two percentages to annual earnings: one percentage for a "Wage Incentive Bonus" and the other percentage for a "Lump Sum Merit Bonus." It was having these "two percentage bonuses" existing "side-by-side" that destroyed any "mathematical equivalence." *Id.* at 1011.

the Ninth Circuit's interpretation of the FLSA in *Russell*). Therefore, this Court should reverse a Default Judgment in excess of $13.1 million where that Default Judgment is premised on an unprecedented (and erroneous) interpretation of what the FLSA requires.

### H.    Hornady, et al. cannot substantiate their $13.1 million (or $16.6 million, including the cross-appeal) in damages through any affidavit, much less through live testimony.

OTK explained in its opening Brief that, under *Adolph Coors Co. v. Movement Against Racism & the Klan*, 777 F.2d 1538, 1544 (11th Cir. 1985), a default judgment must be supported by "detailed affidavits." (Appellant's Br. 63.) In their Appellees' Brief, Hornady, et al. do not dispute that their calculation of $13,171,958.56 in damages (or $16,679,460.22, including the cross-appeal) was not supported by any affidavit, much less a "detailed" one.[24] Instead, they argue that this Court's decision in *Adolph Coors* does not require affidavits for amounts "capable of mathematical calculation." (Appellees' Br. 76.)

---

[24] Hornady, et al. eventually placed a "Declaration of Jeff Mroz" (Doc. 415-4) in the record, but that was submitted in support Hornady, et al.'s "Petition for Attorneys' Fees, Expenses and Costs" (Doc. 416) and came after the district court had already accepted Hornady, et al.'s calculations.

As applied here, Hornady, et al.'s interpretation of the *Adolph Coors* exception for "mathematical calculations" would eviscerate the general rule in *Adolph Coors* requiring detailed affidavits. Hornady, et al.'s acknowledge: "Very occasionally, a ghost in the machine leads to a minute or two variation." (Doc. 360, PageID 5576.) In calculating $13.1 million in damages (or $16.6 million, including the cross-appeal), the minutes add up. Hornady, et al.'s own acknowledgements of the occasional "ghost in the machine" take their complex calculations out of the realm of mere "mathematical calculations."

Likewise, one of the issues in the parties' "Joint Submission on Damages" was OTK's claim to a credit for the total amount of $334,045.58 paid to some of the members of the collective (namely, those who were employed at OTK as of January 2021). Hornady, et al. now object that "the amounts were not calculated on a weekly basis." (Appellees' Br. 65.) That is a bizarre argument to make, insofar as the August 2022 "Joint Submission on Damages" contains the following explanation in laying out the steps for the calculation of this $334,045.58, including the following: "Defendant then added up **the daily totals** from the comparison outlined in sub-paragraph d. above to obtain a total number of hours **using the**

**workweeks** described in sub-paragraph e. above." (Doc. 406, PageID 6642 (emphasis added).) In other words, OTK ran the calculations "daily," by shift, and then weekly, using OTK's workweek. Hornady, et al.'s argument that OTK did not run the calculations "based on individual weeks" is nonsense.

However, the fact that neither OTK's calculations nor Hornady, et al.'s calculations set forth in the "Joint Submission on Damages" were subject to cross-examination is exactly why *Adolph Coors* requires a hearing on damages or, at minimum, "detailed affidavits." The district court's acceptance of Hornady, et al.'s numbers based on a "Joint Submission on Damages" with pages and pages of caveats is reversible error. To give just one example of such a caveat, OTK specifically noted, as part of the "Joint Submission," that the methodology used by Hornady, et al. "is flawed, insofar as Plaintiffs' calculations do not always give Defendant credit for the 'regular' (i.e., non-overtime pay) time paid to Plaintiffs on hours Plaintiffs have re-designated as 'overtime' hours by changing the workweek definition from the definition used in Defendant's time and attendance software." (Doc. 406, PageID 6630.) This was an issue raised at the trial in the companion *Gibson* case, and

it may have been a reason that the jury in that case discredited the FLSA damages calculations run by the same computer programmer who ran the damage calculations for Hornady, et al. *See* Def's Resp. to Pl.'s Mot. for New Trial Pursuant to Fed. R. Civ. P. 59, *Gibson v. Outokumpu Stainless USA, LLC*, No. 21-00103-JB-N (S.D. Ala. July 13, 2023), ECF No. 177, PageID 5853.[25]

Hornady, et al. have not disputed that they have not given OTK credit for all the overtime actually paid to members of the collective. Instead, they would have this Court simply "rubber-stamp" a $13.1 million figure calculated relying on Hornady, et al.'s flawed methodology and adopted, uncritically, by the district court. This Court should not provide such a "rubber stamp."

## I.  **Regarding Hornady, et al.'s cross-appeal, entering a default as to liability does not mean that a district court should ignore the applicable statutes of limitations on a plaintiff's claims.**

Hornady, et al. argue that OTK could not "rely on a SOL affirmative defense to limit the damages sought" insofar as one result of the district

---

[25] The record in the present appeal shows that the computer programmer testified that he used the same methodology in *Gibson* that he used for Hornady, et al.'s damage calculations. (Doc. 396-5, PageID 6542-6543.)

court's November 18, 2021 Order (Doc. 344) was the striking of OTK's Answer (Doc. 228) to the Third Amended Complaint. (Appellees' Br. 79.) However, the district court's default sanctions were purportedly as to liability only, and the district court's November 18, 2021 Order expressly left "Plaintiff's proof of damages" to be resolved at a later time. (Doc. 344, PageID 4718.) And, whether a defendant asserts a statute-of-limitations defense or not, "damages are never an element of an asserted defense— affirmative or otherwise; rather … it is the plaintiff's responsibility to prove damages." *Jerkins v. Lincoln Elec. Co.*, 103 So. 3d 1, 10 (Ala. 2011).

"A default judgment is unassailable on the merits **but only** so far as it is supported by **well-pleaded allegations**, assumed to be true." *Nishimatsu Constr. Co. v. Houston Nat'l Bank*, 515 F.2d 1200, 1206 (5th Cir. 1975) (emphasis added). Allegations, however, cannot be "well-pleaded" when those allegations contravene a statute of limitations. Hornady, et al. fail to address the law on this issue, but the Eleventh Circuit has observed that a pleading asserting claims barred the statute of limitations can be dismissed "as frivolous." *Clark v. Ga. Pardons & Paroles Bd.*, 915 F.2d 636, 640 n.2 (11th Cir. 1990). Other appellate court have held that a trial court may even raise statute-of-limitations issues

*sua sponte* where the defense is not expressly waived. *See Mischler v. Bevin*, No. 18-5665, 2019 WL 2644639, at *3 (6th Cir. May 8, 2019); *Levald v. City of Palm Desert*, 998 F.2d 680, 687 (9th Cir. 1993); *Leonhard v. United States*, 633 F.2d 599, 609 n.11 (2d Cir. 1980). Thus, a plaintiff's allegations that contravene the statute of limitations cannot be "well-pleaded," especially where, as here, the plaintiff has "notice" that her claims run up against the statute of limitations. *Annette v. Haslam*, No. 3:18-cv-1299, 2020 WL 2520512, at *2 (M.D. Tenn. May 18, 2020).

The relevant statutory language provides that an action for "unpaid overtime compensation" under the FLSA must be commenced within two years (or three years in the case of "willful" violations of the statute). 29 U.S.C. § 255(a). Regarding plaintiffs who later opt-in to FLSA lawsuits certified as collective actions, the statute expressly states that each opt-in an action:

> shall be considered to be commenced in the case of any individual claimant--
>
> (a) on the date when the complaint is filed, if he is specifically named as a party plaintiff in the complaint and his written consent to become a party plaintiff is filed on such date in the court in which the action is brought; or
>
> (b) if such written consent was not so filed or if his name did not so appear--on the subsequent date on which such written

consent is filed in the court in which the action was commenced.

29 U.S.C. § 256. This Court, moreover, has confirmed that the statute means what it says. *Grayson v. K Mart Corp.*, 79 F.3d 1086, 1106 n.38 (11th Cir. 1996) (in an ADEA case analyzing the collective action process under the FLSA, noting that "if a plaintiff joins a pending class action, his action commences when he opts into the action by filing written consent with the court in which the action is pending").

Here, Hornady, et al. argue that 29 U.S.C. § 256(b)'s express statement that an opt-in plaintiff's action commences "on the subsequent date" when "written consent is filed in the court" should be read out of the statute entirely as a result of the court's entry of default against OTK. Hornady, et al. provide no support whatsoever for this argument. The only case law they cite here is *Day v. National Life Insurance Co.*, 122 F.3d 1012 (11th Cir. 1997),[26] but that ADEA case neither examined the requirements of 29 U.S.C. § 256(b) nor did it concern a default judgment. *See Day*, 122 F.3d at 1015 (describing the issue as whether the defendant employer had waived the argument that 29 U.S.C. § 255(a)'s two-year

---

[26] Hornady, et al. erroneously cite this case as *Dav* [*sic*] and not *Day*. (*See* Appellees' Br. 79.)

57

period, rather its three-year period for "willful" violations, should apply). In other words, *Day* involved waiver, pure and simple, not the "well-pleaded complaint" rule.

Here, in contrast to the employer in *Day*, OTK not only raised statute-of-limitations defenses in its (admittedly) stricken Answers (Docs. 19, 54, & 228), but OTK also raised the statute-of-limitations issue again after the district court had entered its November 18, 2021 Order (Doc. 344) striking OTK's Answer to the Third Amended Complaint. (Doc. 363, PageID 5640-5644.) As such, *Day* provides no support either (1) for Hornady, et al.'s attempts to circumvent the maximum three-year look-period provided for in 29 U.S.C. § 255(a) or (2) for Hornady, et al.'s attempts to circumvent 29 U.S.C. § 256(b)'s express statement that each opt-in's action commences at the time at the each time opt-in files his or her respective written consent with the court. In sum, there is no basis for Hornady, et al.'s cross-appeal here.

## J. Hornady, et al. were not denied due process when the district considered, and rejected, the "equitable tolling" arguments that Hornady, et al. raised eight months after the district court's opt-in deadline.

Hornady, et al. claim that they were denied "due process" because they say that the district court's May 30, 2019 Order (Doc. 93) prohibited

further briefing on equitable tolling. (Appellees' Br. 80.) An obvious problem with Hornady, et al.'s argument is that, regardless of whether or not the May 30, 2019 Order meant to prohibit future briefing, Hornady, et al. actually filed such briefing. What's more, the district court considered such briefing as a part of its rulings.

Specifically, on May 19, 2020, Hornady, et al. filed a "Renewed Motion to Equitably Toll Statute of Limitations." (Doc. 204.) It was this "Renewed Motion"—and not Hornady, et al.'s original August 2018 motion (Doc. 22)—that the district court then ruled on as of February 3, 2021. The district court's February 3, 2021 Order began with the following sentences: "This matter is before the Court on Plaintiffs' Renewed Motion to Equitably Toll the Statute of Limitations. (Doc. 204). The parties have briefed the Motion and it is ripe for review." (Doc. 276, PageID 3552.)

Hornady, et al. gloss over the record on their cross-appeal when arguing: "[T]he May 30, 2019 Order identified individualized issues about tolling but prohibited briefing until further order. (Doc. 93, PageID 571-572) There was no other Order, but about 20 months later the district court ruled." (Appellees' Br. 80.) That is not what happened. Instead,

almost a year after the district Court's May 2019 Order (Doc. 93), Hornady, et al. filed a "Renewed Motion" (Doc. 204). That "Renewed Motion" was briefed and ruled upon. (Docs. 213 & 276.) Such a ruling—unlike the sanctions entered against OTK—does not constitute reversible error.

## V.    Conclusion

OTK respectfully asks that this Court deny Hornady, et al.'s cross-appeal seeking an additional $3.5 million in damages but reverse the district court's entry, as a discovery sanction, of a Default Judgment against OTK in an amount in excess of $13.1 million and remand this case to the district court with instructions to resolve the case on the merits.

Respectfully submitted,

s/ Devin C. Dolive
One of the Attorneys for
Appellant–Cross-Appellee
Outokumpu Stainless USA, LLC

OF COUNSEL
Devin C. Dolive
BURR & FORMAN LLP
420 North 20th Street
Suite 3400
Birmingham, Alabama 35203

60

(205) 251-3000
ddolive@burr.com

Cheri Turnage Gatlin
BURR & FORMAN LLP
190 East Capitol Street
Suite M-100
Jackson, Mississippi 39201
(601) 709-3444
cgatlin@burr.com

No. 22-13691

*William Hornady, et al. v. Outokumpu Stainless USA, LLC*

## Certificate of Compliance

This brief complies with the type-face requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6). The brief is in 14-point Century Schoolbook, which is a proportionately spaced font that includes serifs.

This brief complies with the type-volume limitations in Federal Rule of Appellate Procedure 32(a)(7)(B)(i) because it contains 12,934 words, excluding the parts of the brief that are exempt under Federal Rule of Appellate Procedure 32(f).

s/ Devin C. Dolive
OF COUNSEL

62

No. 22-13691

*William Hornady, et al. v. Outokumpu Stainless USA, LLC*

## Certificate of Service

I certify that on July 14, 2023, a copy of the foregoing has been electronically filed with the Clerk of the Court using the CM/ECF system, which will serve it on the following CM/ECF participants. If a party served does not participate in the CM/ECF system, I have served them by U.S. First Class.

Ian D. Rosenthal, Esq.
Davis, Davis and Associates
27180 Pollard Road
Daphne, Alabama 36526
ian@ddalawfirm.com

Patrick H. Sims, Esq.
P. O. Box 2906
Mobile, Alabama 36652
patrick@simslawfirm.net

Frederick G. Helmsing, Jr., Esq.
McDowell Knight Roedder &
   Sledge, LLC
11 North Water Street
Suite 13290
Mobile, Alabama 36602
fhelmsing@mcdowellknight.com

s/ Devin C. Dolive
OF COUNSEL